VRABEL, APPELLANT, *v.* VRABEL, APPELLEE.

(No. 44578—Decided March 24, 1983.)

*Mr. Sanford J. Berger* and *Mr. Robert M. Fertel,* for appellant.

*Messrs. Hyman, Hyman & Carlson* and *Mr. Frank S. Carlson,* for appellee.

DAY, P.J. This is a suit founded on theories of contract and tort. It stems from conditions which developed following the parties' divorce. The complaint of the plaintiff-appellant ex-wife, Lana Vrabel (plaintiff), was dismissed by the trial court on motion. In issue is the constitutionality of Ohio's "heart balm" statute.

The judgment is affirmed.

## I

The parties were divorced in January 1979. Later that year, the plaintiff moved with her four children to Maumee, Ohio. Her ex-husband, defendant-appellee, William Vrabel (defendant), continued living in the Cleveland area. The plaintiff purchased real estate and a new home and found employment at $290 per week.

Although divorced, the parties continued to see each other on a casual basis. Then, the plaintiff alleged:

"[D]uring December, 1980, and January, 1981, the defendant commenced an intensive campaign by telephone, letter and visitation to persuade the plaintiff to move, with her children, from the Maumee area to the Cleveland area so that they could be re-united in a reconciliated relationship."

She asserted that these "inducing representations" were false:

"[They were] * * * made with the intent of motivating the plaintiff to return to the Cleveland area to her detriment, embarrassment and expense, as the actions of the defendant were actuated in fraud and deceit, were wantonly conceived, and mendaciously calculated to exact revenge upon the plaintiff for divorcing him, and to derive the self-satisfaction of knowing he could have her back."

Believing her ex-husband, the plaintiff left her job and returned to Cleveland with her children in January 1981. After five months, on July 2, 1981, the defendant "married another."

Count One of the complaint sounded in tort. Plaintiff claimed $25,000 in damages caused by the defendant's fraudulent misrepresentation of his intent to marry. Count Two incorporated the facts alleged in the first count and sought recovery also of $25,000 on a contract theory.

The latter count was based on the parties' separation agreement which contained this provision:

"Husband and Wife shall hereafter live separately and apart from the other and each shall go his or her own way without direction, control or molestation from the other the same as though unmarried, and each further agrees not to annoy or interfere with the other in any manner whatsoever."

The plaintiff alleged that the same facts which made out her first cause of action also constituted "molestation" and breach of this contractual provision.

No answer was filed. Rather, the defendant filed a motion to dismiss on two grounds: (1) the complaint failed to state a

claim upon which relief could be granted, and (2) the court lacked subject matter jurisdiction of the second count.

On October 6, 1981, the motion to dismiss was granted with prejudice. By timely notice, this appeal was then brought.

The plaintiff assigns three errors:

### Assignment of Error No. I

*"Ohio Revised Code Sec. 2305.29,* which abolished three common law causes of action, is unconstitutional and void as being violative of *Section 2, Article I* of the Ohio Constitution, in that it denies equal protection and benefit of the law to the people of this state by its grant of a special privilege and immunity to a class committing breach of contract, fraud, and moral interference and injury to the sanctity of marital and familial relationships; is violative of *Section 16, Article I* of the Ohio Constitution, in that it closes the courts and denies a remedy by due course of law to some, but not all, of the people of this state, who have been injured in their land, goods, person, or reputation; and is violative of the *Fourteenth Amendment* to the Constitution of the United States, in that it denies due process of law and the equal protection of the laws to the people of this state."

### Assignment of Error No. II

*"Ohio Revised Code Sec. 2305.29,* which abolished certain common law causes of action for civil damages, did not by implication abolish any other civil actions not specifically set forth therein; and to so expand the specific words of the statute would be violative of the 'due course of law' provision of *Section 16, Article I* of the Ohio Constitution, prohibiting the taking of property without due course of law, and the 'Due Process' Clause of the *Fourteenth Amendment* to the Constitution of the United States."

### Assignment of Error No. III

"A 'chose in action' is a valuable property right, which may not be taken from a citizen without due course of law, and the fourth paragraph of Civ. R. 52, which permits such a taking without explanation or justification, is unconstitutional as being violative of *Sections 1, 11 and 16[, Article I]* of the Ohio Constitution, and the *First* and *Fourteenth Amendments* to the Constitution of the United States."

For reasons adduced below, none of the assignments of error is well-taken.[1]

---

[1] The constitutional sections upon which the assignments rely are set out in this footnote in relevant part. The pertinent texts are:

Constitution of the United States:

Amendment I:

"Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof; or abridging the freedom of speech, or of the press; or the right of the people peaceably to assemble, and to petition the Government for a redress of grievances."

Amendment XIV:

"Section 1. All persons born or naturalized in the United States, and subject to the jurisdiction thereof, are citizens of the United States and of the State wherein they reside. No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws."

Constitution of Ohio:

Article I:

"Section 1. All men are, by nature, free and independent, and have certain inalienable rights, among which are those of enjoying and defending life and liberty, acquiring, possessing, and protecting property, and seeking and obtaining happiness and safety.

"Section 2. All political power is inherent in the people. Government is instituted for their equal protection and benefit, and they have the right to alter, reform, or abolish the same, whenever they may deem it necessary; and no special privileges or immunities shall ever be granted, that may not be altered, revoked, or repealed by the General Assembly."

## II

### A

The question raised by the first assignment of error is, broadly, whether the Ohio "heart balm" statute, R.C. 2305.29, denies due process and/or equal protection under the United States Constitution and due course of law and equal protection[2] under the Ohio Constitution by abolishing specified common-law causes of action. This, it is claimed, effectually extends a special immunity to a class of fraudulent persons allowing them to breach contracts, commit fraud, and inflict injury without recourse by the injured. The first concern is whether the abolition of amatory actions blocks the claims raised here.

The statute provides:

"No person shall be liable in civil damages for any breach of a promise to marry, alienation of affections, or criminal conversation, and no person shall be liable in civil damages for seduction of any person eighteen years of age or older who is not incompetent, as defined in section 2111.01 of the Revised Code."

To avoid the effect of R.C. 2305.29, the plaintiff claims there was no offer of marriage involved — only one of a "reconciled relationship." But the complaint must be read as a whole. *Kennard* v. *Palmer* (1944), 143 Ohio St. 1, 6 [27 O.O. 554]. The precipitating event giving rise to the action here was the defendant's marriage to another woman. If, in fact, "reconciliation" meant only friendship, the defendant's marriage did not cause any injury to the plaintiff. Thus, arguably the plaintiff's complaint can establish injury only if the representations made were promises of marriage.

In its lowest terms then, the dispute under the plaintiff's first count is whether the abolition of civil liability for a breach of promise to marry bars redress in an action for fraud where it is a promise to marry that is alleged to be fraudulent. This is a question of first impression in this state.

Heart balm statutes, though the wording and reach may differ from state to state, were passed to put an end to what were seen as gross abuses of court process arising from romantic relationships or, perhaps more accurately, arising from the acerbity of cooled ones. A brief look at an old Ohio case for breach of promise to marry reveals what depths amatory rancor can reach. In *Duvall* v. *Fuhrman* (1887), 3 Ohio C.C. 305, 312, the court remarked:

"The conduct of the defendant below, Duvall, deserves the severest criticism and condemnation. I never knew anything equal to it; I never heard anything equal to it; I never read anything in truth or fiction, that bore any resemblance to it. The conduct of Duvall is simply imfamous [*sic*]. His attempts to manufacture evidence for himself, to entrap the plaintiff in the action, his suggestions made to her by persons hired for that purpose, to use forged papers and to sustain her cause by perjury, their endeavors to get her into infamous places, when they might accuse her of lewd acts; his sending his wife, in company with an advanturess

---

"Section 11. Every citizen may freely speak, write, and publish his sentiments on all subjects, being responsible for the abuse of the right; and no law shall be passed to restrain or abridge the liberty of speech, or of the press. In all criminal prosecutions for libel, the truth may be given in evidence to the jury, and if it shall appear to the jury, that the matter charged as libelous is true, and was published with good motives, and for justifiable ends, the party shall be acquitted."

"Section 16. All courts shall be open, and every person, for any injury done him in his land, goods, person, or reputation, shall have remedy by due course of law, and shall have justice administered without denial or delay."

[2] Plaintiff does not refer specifically to the Equal Protection Clause in Section 26, Article II of the Ohio Constitution.

[*sic*], to the plaintiff, with the story that she too had been the victim of his lust, and who confidingly tried to get from her statements prejudicial to her cause; the testimony he gave on the trial; all these things show a depth of meanness beyond which it would be difficult to go, and the only wonder is that the jury were not overwhelmed with indignation and did not give a verdict for all that was claimed by the plaintiff in her petition ($15,000). We are all perfectly satisfied with the verdict."

Though it is easy to share the indignation at Duvall's infamy, many legislatures apparently came to the conclusion that the courts were not the place for redress.

The preamble to the New York heart balm statute exemplifies the change of view:

" 'The remedies heretofore provided by law for the enforcement of actions based upon alleged * * * breach of contract to marry, having been subjected to grave abuses, causing extreme annoyance, embarrassment, humiliation and pecuniary damage to many persons wholly innocent and free of any wrongdoing, who were merely the victims of circumstances, and such remedies having been exercised by unscrupulous persons for their unjust enrichment, and such remedies having furnished vehicles for the commission or attempted commission of crime and in many cases having resulted in the perpetration of frauds, it is hereby declared as the public policy of the State that the best interests of the people of the State will be served by the abolition of such remedies.' " *Sulkowski* v. *Szewczyk* (1938), 255 App. Div. 103, 103-104, 6 N.Y. Supp. 2d 97, 97-98.

In *Sulkowski* the New York court was faced with a question similar to the one presented here. The plaintiff alleged that the defendant's proposal of marriage to her was fraudulent in that he was already married. She sought recovery for his false representation that he was single. On appeal, dismissal of the complaint was affirmed. The court reasoned that:

"If plaintiff's contention be correct, then any action based upon a breach of promise to marry could be turned into an action for misrepresentation by merely alleging that the promise of marriage was a sham, made solely for the purpose of taking advantage of the plaintiff." *Id.* at 104, 6 N.Y. Supp. 2d, at 98.

If anything, the fraud alleged in *Sulkowski* was stronger than that alleged by the present plaintiff. Yet the New York court found that to allow the claim would undercut the purpose of the statute.

The case of *A.B.* v. *C.D.* (E.D. Pa. 1940), 36 F. Supp. 85, affirmed (C.A. 3, 1941), 123 F.2d 1017, involved a similar controversy. The plaintiff sought to recover damages sustained as a result of the defendant's fraudulent promise to marry her. The damages sought were limited to actual financial loss. Looking at both the New York and Pennsylvania statutes the court dismissed the complaint. The rationale was that:

"* * * [T]here is a policy enunciated by these enactments abolishing breach of promise actions which is broader than their letter. The legislatures evidently have been prompted by concern for the public morals and for the frequently innocent victims of breach of promise actions to preclude resort to the courts for relief from injury consequent to breached promises of marriage. This is true whether the acceptance was made as a result of succumbing to the deceitful wiles of a gay Lothario or as a result of the worshipful wooing of an ardent yet sincere swain. The legislatures did not intend that courts should explore the minds of suitors and determine their sincerity at the moment of proposal of marriage but rather declared it to be the policy of the state that in the event a breach of promise occurs relief will be denied in the courts." *Id.* at 87.

The reasoning is persuasive. Accord-

ingly, it is held that R.C. 2305.29 abolishes liability in civil damages where the promise to marry is fraudulent; and this is so even though the action is cast in terms of the tort of deceit.

B

The Supreme Judicial Court of Massachusetts in *Thibault* v. *Lalumiere* (1945), 318 Mass. 72, 60 N.E. 2d 349, considered an attempt to avoid the heart balm statute by framing a complaint in terms of an alternative theory — the torts of assault and battery, and deceit. The plaintiff contended that the defendant's fraudulent representations of love and marriage vitiated her consent to their intimacies. The court found that:

"* * * [T]he only ground for contending that such acts constituted a wrong was his intent not to carry out his promise to marry her and so was directly attributable to the breach of contract to marry * * *." *Id.* at 74, 60 N.E.2d, at 350.

A factually different but comparably evasive tactic is represented in the present plaintiff's contract count. The breach of contract alleged depends upon the "direction, control or molestation" clause of the parties' separation agreement. However, the cause of action matures, if at all, because the plaintiff claims that acts by the defendant implying a promise of marriage breached the no molestation feature of the separation agreement. But when the breach of the contract — defendant's promise not to commit acts of "direction, control or molestation" — arises, at bottom, out of the breach of an implicit new promise to marry, or a fraudulent representation of intent to marry, the statute intervenes.

Thus, plaintiff's second cause of action, the contract claim, is also barred.

Because R.C. 2305.29 blocks the remedy for the claims which are under consideration in this case, the plaintiff has stated causes of action only if the statute is invalid. This makes determination of the constitutionality of the statute unavoidable.

C

The Fourteenth Amendment and Sections 2 and 16, Article I of the Ohio Constitution are invoked by the plaintiff to support these propositions:

1. The statute grants privileges and immunities to a special class of contract breachers, defrauders and immoral persons who interfere with, and injure, the sanctity of marital and family relationships.

2. The consequence of (1) is that the courts of Ohio are closed and due process, due course of law and equal protection are denied to some persons (not all) who have suffered injury to "land, goods, person, or reputation."

To support the contentions, one would have to agree with plaintiff's implicit assumptions, *i.e.,* that contracts to marry are in all binding particulars equivalent to commercial agreements; that all parties to a nuptial executory covenant acquire rights and obligations of no more, and no different, value than parties to the meanest market place bargain, and, by virtue of the United States and Ohio Constitutions, are comparably immune from impairment by the legislature.

Such a concept of marriage was repudiated by clear implication nearly a century ago in the leading case of *Maynard* v. *Hill* (1888), 125 U.S. 190. That case characterized the marriage contract as the creator of the "* * * most important relation in life, * * * having more to do with the morals and civilization of a people than any other institution, * * *." *Id.* at 205.

And its importance has always made it subject to the control of the legislature.[3] Accordingly:

---

[3] The court discussed the social aspects of marriage problems, noted the historical fact that the English parliamentary authority had included the granting of divorces, and that the colonial legislative assemblies "treated the subject as one within their province." *Id.* at 206.

"That body prescribes the age at which parties may contract to marry, the procedure or form essential to constitute marriage, the duties and obligations it creates, its effects upon the property rights of both, present and prospective, and the acts which may constitute grounds for its dissolution." *Id.*

To support the conclusion that nuptial contracts were not protected by that prohibition of the United States Constitution forbidding state impairment of contracts, the *Maynard* court adopted a dictum of Chief Justice Marshall from the *Dartmouth College* case:

" 'The provision of the Constitution never has been understood to embrace other contracts than those which respect property or some object of value, and confer rights which may be asserted in a court of justice. It never has been understood to restrict the general right of the legislature to legislate on the subject of divorces.' [17 U.S.] 4 Wheat. 629." *Id.* at 210.

The implicit rationale is that power to regulate the termination of marriage necessarily includes power to regulate its inception. A consonant conclusion was reached by the highest court of the state of New York in *Fearon* v. *Treanor* (1936), 272 N.Y. 268, 5 N.E. 2d 815. There, in the course of upholding the constitutionality of a statute abolishing actions for breach of promise to marry, it was said:

"We place our decision upon the broad ground that the Legislature in dealing with the subject of marriage has plenary power.

"In this state marriage is considered a civil contract, but of a peculiar character and subject to peculiar principles. * * *

" 'It, certainly, does differ from ordinary common-law contracts, by reason of its subject-matter and of the supervi-sion which the State exercises over the marriage relation, which the contract institutes. In such respects, it is *sui generis*. While the marriage relation, in its legal aspect, has no peculiar sanctity, as a social institution, a due regard for its consequences and for the orderly constitution of society has caused it to be regulated by laws, in its conduct as in its dissolution.' * * *

"Marriage is more than a personal relationship between a man and a woman. It is a status founded on contract and established by law. It constitutes an institution involving the highest interests of society. It is regulated and controlled by law based upon principles of public policy affecting the welfare of the people of the State. * * *

"There are, in effect, three parties to every marriage, the man, the woman and the State. * * * Marriage is not a contract within the meaning of the provision of the Federal Constitution which prohibits the impairment by the States of the obligation of contracts." *Id.* at 271-272, 5 N.E.2d at 816. (Citations omitted.)

In Indiana a "due course of law" provision in the state Constitution established a remedy for injury to property. The provision was deemed not to affect the legislature's power to regulate marriage and divorce. And, if those institutions were within the legislative authority, an incident of it, *i.e.,* the right of action for alienation of affections, was certainly under legislative control. *Pennington* v. *Stewart* (Ind. 1937), 10 N.E. 2d 619, 621. From this one might conclude reasonably that Indiana would regard all peripheral incidents to the marriage contract, such as breach of promise suits constitutionally subject to legislative control.

According to an A.L.R. annotation[4] the courts, with only one contrary expres-

<hr>

[4] Annotation, Constitutionality, construction, and application of statutes abolishing civil actions for alienation of affections, criminal conversation, seduction, and breach of promise to marry (1945), 158 A.L.R. 617.

sion,[5] have upheld the constitutionality of the statutes abolishing amatory actions.

Even if there were not persuasive precedent outside Ohio to support the *sui generis* character of marital contracts as well as the constitutionality of legislative abolition of amatory actions, the logic of Ohio's legal custom compels it.

For as long as one need remember, the legislature has treated marriage and divorce as proper subjects of the legislative police power. Statutory regulation has governed qualifications and eligibility for marriage, R.C. 3101.01; licensing, R.C. 3101.05, 3101.06; waiting periods, R.C. 3101.05; health standards, R.C. 3101.05, 3101.06; grounds for divorce, R.C. 3105.01; consent dissolutions, R.C. 3105.61 *et seq.;* alimony and property division, R.C. 3105.17 *et seq.;* parental obligations to children, R.C. 2919.21 *et seq.;* and child support, R.C. 3109.05. This list does not exhaust the examples, but these and other state actions regulating marriage and its incidents are so unassailably constitutional that only the quixotic would challenge them.

Against this background, the plaintiff's sequiturs will not support the due process claim under consideration. R.C. 2305.29 is a rational exercise of the state's plenary power over the marriage relation and its incidents; there is no fundamental right to bring an amatory action. Cf. *Pennington* v. *Stewart, supra,* at 621. A contrary result would compel the conclusion that Sections 2 and 16, Article I of the Ohio Constitution and/or the Fourteenth Amendment place remedies for breach of agreements based on emotion and affection beyond legislative reach and at the same time invest them with attributes recognizable in conventional contract and tort concepts. The state and federal Constitutions do not demand such bizarre results.

The plaintiff's equal protection claim must be dispatched in the same fashion. There is no fundamental right to bring an amatory action; with an even hand the state has denied the cause to all would-be suitors.

In this respect R.C. 2305.29 differs from the "guest statute" which was found unconstitutional under the Equal Protection Clause of the Fourteenth Amendment and the due course of law provision of Section 16, Article I of the Ohio Constitution. *Primes* v. *Tyler* (1975), 43 Ohio St. 2d 195, 204-205 [72 O.O.2d 112]. The guest statute discriminated within the class of automobile-tort plaintiffs, barring recovery only to those who rode gratuitously; if a fee was paid the injured retained his remedy at law. The "prevention of spurious claims" (a legitimate state objective) was "not 'suitably furthered' * * * by the guest statute nor by the differential treatment afforded therein to guests and passengers." *Id.* at 201.

With the statute abolishing amatory actions, however, all would-be plaintiffs who frame their causes of action on amatory grounds are denied recovery. This non-discriminatory elimination of the cause of action furthers legitimate state purposes, and the classification rests on grounds relevant to the objective. *McGowan* v. *Maryland* (1961), 366 U.S. 420, 425 [17 O.O.2d 280]. Therefore, the equal protection claim fails. And due course of law under the Ohio Constitution and equal protection under the Fourteenth Amendment are not violated by legislative enactments which apply a

---

[5] *Wilder* v. *Reno* (M.D. Pa. 1942), 43 F. Supp. 727 (injunction action to prevent enforcement of a criminal statute regulating amatory actions). The annotation was prompted by *Thibault* v. *Lalumiere, supra,* which predated *Heck* v. *Schupp* (1946), 394 Ill.

296, 68 N.E. 2d 464, by one year. *Heck* held the Illinois heart balm statute violated the state constitutional "right to a remedy," see, *infra,* fn. 6. The *Heck* decision occasioned a supplementing annotation at 167 A.L.R. 235 (1947).

legitimate policy evenhandedly to all the people of this state. *Primes, supra.*

Section 16, Article I guarantees a remedy for every *legally cognizable* injury to person, property, or reputation. And it must ultimately be up to the legislature to define what injuries are legally cognizable. Section 16, Article I is not a petrifier of every cause of action that existed in this state when the section was adopted. If it were, all statutes in derogation of common-law rights of action would be vulnerable to constitutional attack. That this is not the case could be shown by many examples. The workers' compensation statutes and subsequent cases which uphold the barring of certain common-law tort claims and defenses demonstrate one. See, *e.g., State, ex rel. Yaple,* v. *Creamer* (1912), 85 Ohio St. 349, 353-358. While there may be certain due process limits beyond which a legislature may not go in limiting common-law rights of action, those limits have not been reached here.[6]

R.C. 2305.29 is valid under the state and federal Constitutions.

Assignment of Error No. I has no merit.

### III

The second assignment of error also challenges the constitutionality of the statute under the due process-due course of law provisions of the federal and state Constitutions *if* the enactment is read expansively to bar her claims in this case. Plaintiff claims an expansion is void because such a swollen reading of the statute invades her property rights, *i.e.,* the chose in action representing her claim is extinguished.

The respective Constitutions do pro-tect property rights. But, while contract rights are considered a form of property, a marriage covenant is far different from the conventional private contract. There is no property right in the affections of another person, *Pennington* v. *Stewart, supra,* at 621; *Hanfgarn* v. *Mark* (1937), 274 N.Y. 22, 26, 8 N.E. 2d 47, 48. Of necessity then, there can be no property right in the cause of action which seeks to make whole that which itself is not "property."

Moreover, there is no vested right to bring a common-law cause of action:

" 'A person has no property, no vested interest, in any rule of the common law. That is only one of the forms of municipal law, and is no more sacred than any other. Rights of property which have been created by the common law cannot be taken away without due process; but the law itself, as a rule of conduct, may be changed at the will * * * of the legislature, unless prevented by constitutional limitations. Indeed, the great office of statutes is to remedy defects in the common law as they are developed, and to adapt it to the changes of time and circumstances.' " (Citations omitted.) *Mondou* v. *N.Y., N.H., & H. RR. Co.* (1911), 223 U.S. 1, 50. See, also, *Thompson* v. *Ford* (1955), 164 Ohio St. 74, 79 [57 O.O. 96].

In the exercise of its plenary power, the legislature has constitutional authority to abolish amatory causes of action (see Part II, *supra*). And when, as in this case, claims are rooted in, or stem from, the alleged conjugal contract, then they too are barred as a result of the legislative elimination of the breach of promise

---

[6] The plaintiff relies on *Heck* v. *Schupp* (1946), 394 Ill. 296, 68 N.E. 2d 464, which found a heart balm statute in violation of a state constitutional right to a remedy provision. See Annotation, 167 A.L.R. 235 (1947).

The court there thought the statute tends to "put a premium on the violation of moral law." *Heck, supra,* at 299, 68 N.E. 2d, at 466. It has been suggested that "[i]n utilizing its own views of morals and the wisdom of 'heart balm' legislation, the court appears to have exceeded the power traditionally vested in the judiciary." Note, 47 Colum. L. Rev. 503, 505 (1947).

272

remedy. *Thibault* v. *Lalumiere, supra,* at 75, 60 N.E. 2d at 351.

Assignment of Error No. II has no merit.

## IV

The text applicable to the third assignment of error makes it clear that the plaintiff claims: (1) a violation of due process under the United States Constitution, and (2) a violation of due course of law under the Ohio Constitution because the claims were dismissed without explanation.[7] This came in response to what apparently was a Civ. R. 12(B)(1) and (6) motion. This was permissible under the provenance of the third[8] paragraph of Civ. R. 52.

One might agree with the appellant that an unreasoned exercise of judicial power violates due process, but a judgment under Civ. R. 12(B)(1) and (6) without the formal opinion is not a good example of violation. Judgments without announced reasons are not necessarily unsupported by reason. There is no rule mandate for an exposition of the judicial rationale for granting a motion under Civ. R. 52. And, when a movant states the

ground to be (1) lack of jurisdiction over the subject matter, and (2) failure to state a claim on which relief can be granted, the dismissal which follows can be presumed to rest on one of the grounds assigned or both. Under these circumstances, the plaintiff is not without at least an intimation of the basis for the ruling.

Moreoever, plaintiff has exercised her right of appeal. R.C. 2505.03; App. R. 3 and 4. In addition, the reasons given in this opinion in disposing of each assignment of error are necessary to meet the requirements of App. R. 12(A). Taken together these expositions certainly satisfy any due process or due course claim based on an alleged lack of explanation. And, if the explanation is unsatisfactory, the Supreme Court of Ohio is open.

Assignment of Error No. III has no merit.

## V

The judgment of the trial court is affirmed.

*Judgment affirmed.*

CORRIGAN and NAHRA, JJ., concur.

[7] The plaintiff's mention of the free speech provisions of the Ohio and federal Constitutions is incomprehensible.

[8] The plaintiff mistakenly cites the fourth paragraph of the rule.