STROCK, APPELLANT AND CROSS-APPELLEE, *v.* PRESSNELL, APPELLEE AND CROSS-APPELLANT; SHEPHERD OF THE RIDGE LUTHERAN CHURCH, APPELLEE.

[Cite as Strock *v.* Pressnell (1988), 38 Ohio St. 3d 207.]

(Nos. 87-1550 and 87-1557—Submitted April 20, 1988—
Decided August 24, 1988.)

*Robert D. Gary, Jori Bloom Naegele* and *Dale A. Baich,* for appellant and cross-appellee.

*Wegman, Hessler, Vanderburg & O'Toole* and *Peter A. Hessler,* for appellee and cross-appellant.

*McNeal, Schick, Archibald & Biro Co., L.P.A.,* and *Donald F. Black,* for appellee Shepherd of Ridge Lutheran Church in case No. 87-1550.

WRIGHT, J. Appellant's complaint against Pressnell and the Shepherd of the Ridge Lutheran Church was premised on a variety of tort theories. Before addressing the validity of the complaint and the underlying theories of recovery, we must first determine whether the protections provided by the First Amendment bar this cause.

## I

The threshold question whenever the Free Exercise Clause is invoked is whether the contested conduct is in fact religious in character. "In the spiritual counseling context, the free exercise clause is relevant only if the defendant can show that the conduct that allegedly caused plaintiff's distress was in fact 'part of the beliefs and practices' of the religious group." Note, Intentional Infliction of Emotional Distress by Spiritual Counselors: Can Outrageous Conduct Be "Free Exercise"? (1986), 84 Mich. L. Rev. 1296, 1302 (hereinafter referred to as "Outrageous Conduct").

Religious institutions are not immune from tort liability. The doctrine of religious and/or charitable immunity from tort liability has been abolished in Ohio. *Albritton* v. *Neighborhood Centers Assn.* (1984), 12 Ohio St. 3d 210, 12 OBR 295, 466 N.E. 2d 867. The law in Ohio is now in accord with 4 Restatement of the Law 2d, Torts (1979), Section 895E, which states that "[o]ne engaged in a charitable, educational, religious or benevolent enterprise or activity is not for that reason immune from tort liability."

Likewise, the First Amendment has not been construed to create blanket tort immunity for religious institutions or their clergy. It is well settled that clergy may be sued for the torts they commit. For example, religious leaders have been held liable for obtaining gifts and donations of money by fraud, *United States* v. *Ballard* (1944), 322 U.S. 78; for undue influence in the transfer of property, *Nelson* v. *Dodge* (1949), 76 R.I. 1, 68 A. 2d 51; for the kidnapping of a minor, for damages to the parents resulting therefrom, and for malicious prosecution of the mother in alleging she was an unfit parent, *Magnuson* v. *O'Dea* (1913), 75 Wash. 574, 135 P. 640; for unlawful imprisonment, *Whittaker* v. *Sandford* (1912), 110 Me. 77, 85 A. 399; for homosexual assault, *Mutual Service Cas. Ins. Co.* v. *Puhl* (1984), 354 N.W. 2d 900, cited in Comment, Clergy Malpractice: Bad News for the Good Samaritan or a Blessing in Disguise (1985), 17 U. Tol. L. Rev. 209, 212 (hereinafter referred to as "Clergy Malpractice").

When protection is asserted under the Free Exercise Clause of the First Amendment, as Pressnell does in this case, a court must examine whether such a claim entails valid religious

beliefs or practices. If no legitimate religious beliefs or practices are at issue, then the free-exercise defense becomes frivolous. See Outrageous Conduct, *supra,* at 1303, 1305. The United States Supreme Court addressed the problem of determining the legitimacy of religious beliefs and practices in *Thomas* v. *Review Bd. of the Ind. Employment Secur. Div.* (1981), 450 U.S. 707, 713-714, where the court stated:

"Only beliefs rooted in religion are protected by the Free Exercise Clause, which, by its terms, gives special protection to the exercise of religion. * * * The determination of what is a 'religious' belief or practice is more often than not a difficult and delicate task * * *. However, the resolution of that question is not to turn upon a judicial perception of the particular belief or practice in question; religious beliefs need not be acceptable, logical, consistent, or comprehensible to others in order to merit First Amendment protection."

The court further opined, however, that "[o]ne can, of course, imagine an asserted claim so bizarre, so clearly nonreligious in motivation, as not to be entitled to protection under the Free Exercise Clause * * *." *Id.* at 715.

Notwithstanding the due deference that we are required to give in determining the legitimacy of religious beliefs or practices, we cannot accept the premise that the sexual activities in which Pressnell is alleged to have participated are protected by the Free Exercise Clause. Indeed, it is clear that the alleged conduct was nonreligious in motivation — a bizarre deviation from normal spiritual counseling practices of ministers in the Lutheran Church.[1] Therefore, since Pressnell's alleged conduct falls outside the scope of First Amendment protections, he may be subject to liability for injuries arising from his tortious conduct.[2]

## II

In his complaint against Pressnell, appellant alleged clergy malpractice, intentional infliction of emotional distress, breach of fiduciary duty, fraud, misrepresentation, and nondisclosure. Each of these causes of action is examined separately, and for the reasons set forth below, each is rejected.

## A

While considerable scholarly attention has been focused on the tort of "clergy malpractice" in recent years,[3] most courts have been cautious in ac-

---

[1] Neither Pressnell nor the Shepherd of the Ridge Lutheran Church asserts that the alleged sexual relations were related in any way to the teachings, beliefs, or practices of the Lutheran Church. Indeed, we find it difficult to conceive of pastoral fornication with a parishioner or communicant as a legitimate religious belief or practice in any faith.

[2] Because Pressnell's tortious conduct was not protected under the First Amendment, we need not apply the balancing tests developed in *Lemon* v. *Kurtzman* (1971), 403 U.S. 602; *School Dist. of Abington Twp.*

v. *Schempp* (1963), 374 U.S. 203; or *Sherbert* v. *Verner* (1963), 374 U.S. 398.

[3] See, *e.g.,* Note, Clergy Malpractice: Taking Spiritual Counseling Conflicts Beyond Intentional Tort Analysis (1988), 19 Rutgers L.J. 419; Note, Intentional Infliction of Emotional Distress by Spiritual Counselors: Can Outrageous Conduct Be "Free Exercise"? (1986), 84 Mich. L. Rev. 1296; Comment, Clergy Malpractice: Bad News for the Good Samaritan or a Blessing in Disguise (1985), 17 U. Tol. L. Rev. 209; Comment, Made Out of the Whole Cloth? A Constitutional Analysis of the Clergy

cepting this cause of action. In fact, this theory of recovery was rejected by the same California court and in the very same lawsuit that legal commentators suggest was the genesis of this cause of action. See *Nally* v. *Grace Community Church of the Valley* (1987), 194 Cal. App. 3d 1147, 240 Cal. Rptr. 215, review granted (1988), 243 Cal. Rptr. 86.[4]

The term "malpractice" refers to professional misconduct, *i.e.,* the failure of one rendering services in the practice of a profession to exercise that degree of skill and learning normally applied by members of that profession in similar circumstances. See 2 Restatement of the Law 2d, Torts (1965), Section 299A.

The reluctance of courts to embrace the tort of clergy malpractice may be attributed to the many, and often complex, questions that arise under it. For example, what exactly are the "professional services" rendered by a cleric? And does the standard of the professional vary with the ecclesiastical office? In other words, is a rabbi, priest, pastor, or lay elder held to the same standard of care regardless of training or wide variances in the authority and obligation of religious offices? Also, where a "professional service," such as the marriage counseling involved in this case, is not unique to the cleric, should the cleric be held to the same duty of care as secular counselors? Finally, if a legal duty is imposed on clergy to perform or not to perform in a particular way, will this clash with the religious beliefs of some faiths and thus violate the Free Exercise Clause of the First Amendment to the United States Constitution? See, generally, Esbeck, Tort Claims Against Churches and Ecclesiastical Officers: The First Amendment Considerations (1986), 89 W. Va. L. Rev. 1; Clergy Malpractice, *supra.*

Fortunately, we need not address these and the other vexatious questions that arise in this area because clergy malpractice is not a tort theory that is viable under the facts before us. Malpractice, it must be noted, is not a theory of ordinary negligence or of in-

---

Malpractice Concept (1983), 19 Cal. W.L. Rev. 507; Bergman, Is the Cloth Unraveling? A First Look at Clergy Malpractice (1981), 9 San Fern. V.L. Rev. 47; Ericcson, Clergyman Malpractice: Ramifications of a New Theory (1981), 16 Val. U.L. Rev. 163.

[4] In *Nally,* the parents of a twenty-four-year-old man who committed suicide brought an action against a church and its pastor, alleging clergy malpractice, negligence, and "outrageous conduct." The trial court granted summary judgment on all counts, but the appellate court reversed and remanded for trial. After a three-week trial, the court granted a nonsuit motion, which plaintiffs appealed.

On appeal the second time, the California Second District Court of Appeals rejected the view that it had recognized a cause of action for clergy malpractice in its first opinion:

"The first opinion generated a veritable firestorm of controversy in the nation's law reviews. * * * They called it the seminal case in the new cause of action most frequently labeled 'clergy malpractice.' This court, however, does not view the causes of action discussed in our opinion to involve 'clergy malpractice.' Instead we see them more accurately characterized as 'negligent failure to prevent suicide' and 'intentional or reckless infliction of emotional injury causing suicide' — which negligence and intentional or reckless acts happen to have been committed by church-affiliated counselors. In our view this case has little or nothing to say about the liability of clergymen for the negligent performance of their ordinary ministerial duties or even their counseling duties except when they enter into a counseling relationship with suicidal individuals." 240 Cal. Rptr. at 219.

tentional tort. It is a separate and distinct cause of action. A tortfeasor may be liable for acts of ordinary negligence or for intentional torts, regardless of the "professional" color of his conduct.

For clergy malpractice to be recognized, the cleric's behavior, even if it is related to his "professional" duties, must fall outside the scope of other recognized torts. "It is clear * * * that clergy malpractice is distinct from an intentional tort, since the latter claims are currently actionable against clergymen regardless of their 'professional' nature." Clergy Malpractice, *supra*, at 212. "To be viable, clergy malpractice must address lack of professional skill and the exercise of reasonable professional care, not intentional or reckless behavior directed against the claimant." Note, Clergy Malpractice: Taking Spiritual Counseling Conflicts Beyond Intentional Tort Analysis (1988), 19 Rutgers L. J. 419, 444. "To avoid a redundant remedy, * * * any functional theory of clergy malpractice needs [to] address incidents of the clergy-communicant relationship not already actionable." *Hester* v. *Barnett* (Mo. App. 1987), 723 S.W. 2d 544, 551.

In this case, the alleged acts of Pressnell fell within the realm of intentional tort law, *i.e.,* amatory actions—not malpractice. Therefore, the tort of clergy malpractice cannot be applied to the facts found in this case.[5]

## B

We next address whether appellant can assert a claim against Pressnell for intentional infliction of emotional distress in light of R.C. 2305.29, the statute that abolished amatory actions.

### 1

R.C. 2305.29, which became effective on June 26, 1978, states:

"No person shall be liable in civil damages for any breach of a promise to marry, alienation of affections, or criminal conversation, and no person shall be liable in civil damages for seduction of any person eighteen years of age or older who is not incompetent, as defined in section 2111.01 of the Revised Code."

This statute abolished actions that had evolved from the common-law action of enticing away a servant. Early common law considered a wife to be a servant to her husband. His suit against one who enticed her away was for the loss of services. Prosser & Keeton on Torts (5 Ed. 1984) 916, Section 124. Eventually, the courts also found a wife had a proprietary interest in her husband's services and could sue one who enticed away her husband. *Bennett* v. *Bennett* (1889), 116 N.Y. 584, 23 N.E. 17.

Since the 1930s, more than half of the states have abolished or severely limited actions for alienation of affections and/or criminal conversation, either by statute or judicial decision.[6]

---

[5] This opinion should not be read as precluding an action against a counselor, pastoral or otherwise, in which a counselor is negligent in treating a patient. This opinion is limited to the narrow holding that clergy malpractice is not a viable action under the facts of this case.

[6] Ala. Code 1975, Section 6-5-331; Ariz. Rev. Stat., Section 25-341; West's Ann.

Cal. Civ. Code, Section 43.5; Colo. Rev. Stat. 1973, Section 13-20-202; Conn. Gen. Stat. Ann., Section 52-572b; 10 Del. Code Ann. Rev. 1974, Section 3924; D.C. Code 1981, Section 16-923; West's Fla. Stat. Ann., Section 771.01; Official Ga. Code Ann., Section 51-1-17; West's Ann. Ind. Code, Section 34-4-4-1; 19 Maine Rev. Stat. Ann., Section 167; Md. Code Ann., Courts & Jud. Proc., Section 5-301; Mich. Stat.

The main reason for the abolition of these actions is that they are peculiarly susceptible to abuse:

"* * * [I]t is notorious that they [amatory actions] have afforded a fertile field for blackmail and extortion by means of manufactured suits in which the threat of publicity is used to force a settlement. There is good reason to believe that even genuine actions of this type are brought more frequently than not with purely mercenary or vindictive motives; that it is impossible to compensate for such damage with what has derisively been called 'heart balm'; that people of any decent instincts do not bring an action which merely adds to the family disgrace; and that no preventative purpose is served, since such torts seldom are committed with deliberate plan." Prosser & Keeton, *supra,* at 929.

The trend toward abolition of these actions has expanded in recent years with increased societal interest on personal choice, the decriminalization of sexual activities in many states, and skepticism about the role of law in protecting feelings and enforcing highly personal morality. *Id.* at 930.

2

Before examining the viability of the intentional infliction of emotional distress claim, an *a priori* argument must be addressed, *i.e.,* the constitutionality of R.C. 2305.29. Several Ohio appellate courts have declared the statute constitutional. *Vrabel* v. *Vrabel*

(1983), 9 Ohio App. 3d 263, 9 OBR 477, 459 N.E. 2d 1298; *Haskins* v. *Bias* (1981), 2 Ohio App. 3d 297, 2 OBR 329, 441 N.E. 2d 842; and *Slusher* v. *Oeder* (1984), 16 Ohio App. 3d 432, 16 OBR 503, 476 N.E. 2d 714. We have not yet passed on its constitutionality, but we do so today.

The challenges to the constitutionality of R.C. 2305.29 are that abolition of these common-law actions without providing an alternative remedy is violative of both state and federal Constitutions. The challengers contend that the statute denies due process and/or equal protection under the Fourteenth Amendment to the United States Constitution and due course of law and equal protection under Sections 2 and 16, Article I of the Ohio Constitution. See *Haskins* v. *Bias, supra;* and *Vrabel* v. *Vrabel, supra.*

The United States Supreme Court has emphatically declared that no person has a vested right in any of the rules of the common law:

"A person has no property, no vested interest, in any rule of the common law. * * * Rights of property which have been created by the common law cannot be taken away without due process; but the law itself, as a rule of conduct, may be changed at the will, or even at the whim, of the legislature, unless prevented by constitutional limitations. Indeed, the great office of statutes is to remedy defects in the common law as they are developed, and to adapt it to the changes of time and cir-

---

Ann., Section 27A.2901 [M.C.L.A. Section 600.2901]; Minn. Stat. Ann., Section 553.01; Mont. Code Ann. 1987, Section 27-1-601; Nev. Rev. Stat., Section 41.380; N.J. Stat. Ann., Section 2A:23-1; N.Y. McKinney's Civ. Rights Law, Section 80-a; Ohio Rev. Code, Section 2305.29; 76 Okla. Stat. Ann., Section 8.1; 15 Vt. Stat. Ann., Section 1001; Va. Code 1950, Section 8.01-220; W.Va. Code, Section 56-3-2a; Wis. Stat. Ann., Section 768.01; Wyo. Stat. Ann. 1977 Repub. Ed., Section 1-23-101. See, also, *Fundermann* v. *Mickelson* (Iowa 1981), 304 N.W. 2d 790; *Wyman* v. *Wallace* (1980), 94 Wash. 2d 99, 615 P. 2d 452; and *O'Neil* v. *Schuckardt* (1986), 112 Idaho 472, 733 P. 2d 693.

cumstances." *Munn* v. *Illinois* (1876), 94 U.S. 113, 134; *Second Employers' Liability Cases* (1912), 223 U.S. 1, 50; see *Western Union Tel. Co.* v. *Commercial Milling Co.* (1910), 218 U.S. 406, 416-417.

The federal Constitution does not forbid the abolition of common-law rights so long as it is to attain a permissible legislative objective. *Silver* v. *Silver* (1929), 280 U.S. 117. Indeed, these principles have been applied in the area of "heart balm" statutes, and the Supreme Court, by declining to disturb lower-court verdicts on this issue, has affirmed the principle that the abolition of suits for alienation of affections and related actions is constitutional. See *Hanfgarn* v. *Mark* (1937), 274 N.Y. 22, 8 N.E. 2d 47, appeal dismissed (1937), 302 U.S. 641 (*per curiam*), and, also, *Fearon* v. *Treanor* (1936), 272 N.Y. 268, 5 N.E. 2d 815, appeal dismissed (1937), 301 U.S. 667 (*per curiam*) (both for "want of a substantial federal question").

Similarly, we have consistently held that the legislative branch of state government, unless prohibited by constitutional limitations, may modify or entirely abolish common-law actions. *Thompson* v. *Ford* (1955), 164 Ohio St. 74, 79, 57 O.O. 96, 99, 128 N.E. 2d 111, 115; *Fassig* v. *State, ex rel. Turner* (1917), 95 Ohio St. 232, 248, 116 N.E. 104, 108; *State, ex rel. Yaple,* v. *Creamer* (1912), 85 Ohio St. 349, 97 N.E. 602. As we stated in paragraph one of the syllabus of *Leis* v. *Cleveland Ry. Co.* (1920), 101 Ohio St. 162, 128 N.E. 73: "Rights of property cannot be taken away or interfered with without due process of law. But there is no property or vested right in any of the rules of the common law, as guides of conduct, and they may be added to or repealed by legislative authority."

Thus, we hold that actions for alienation of affections and criminal conversation are not "property in-terests" and the General Assembly enacted R.C. 2305.29 with a permissible legislative objective. This holding is consistent with virtually every other court decision that has addressed the constitutionality of these statutes. See, *e.g., Magierowski* v. *Buckley* (1956), 39 N.J. Super. 534, 121 A. 2d 749; *Ikuta* v. *Ikuta* (1950), 97 Cal. App. 2d 787, 218 P. 2d 854; *Rotwein* v. *Gersten* (1948), 160 Fla. 736, 36 So. 2d 419; *Hanfgarn, supra;* and *Fearon, supra.*

Therefore, we hold that R.C. 2305.29, the statute that abolished amatory actions, is constitutional; it does not violate either Sections 2 and 16, Article I of the Ohio Constitution, or the Equal Protection or Due Process Clauses of the Fourteenth Amendment to the United States Constitution.

### 3

We now address the issue of whether the facts in this case give rise to a cause of action for intentional infliction of emotional distress despite the fact that amatory actions have been abolished by R.C. 2305.29.

In the case at bar, the trial court in effect found that such a cause of action was barred by the statute. The court of appeals, however, reversed, holding that appellant could maintain an action for intentional infliction of emotional distress under the facts in this case.

A majority of the court of appeals below, relying on *Slusher* v. *Oeder, supra,* suggested that this court had implicitly resurrected amatory torts when we decided *Yeager* v. *Local Union 20* (1983), 6 Ohio St. 3d 369, 6 OBR 421, 453 N.E. 2d 666. Such a suggestion is wrong. In *Yeager,* we held that "[o]ne who by extreme and outrageous conduct intentionally or recklessly causes serious emotional distress to another is subject to liability for such emotional distress, and if bodily harm to the other results from it, for

such bodily harm." *Id.* at syllabus. The *Yeager* case, however, did not involve conduct connected with alienation of affections or criminal conversation.

Both majority opinions in the appellate court below and in *Slusher* wrongly assert that while criminal conversation and alienation of affections are no longer actionable torts, the tort of intentional infliction of emotional distress allows for recovery of injuries that were formerly compensable under the abolished actions and that any concomitant interference with the marital relationship is merely incidental.

In recognizing the independent tort of intentional infliction of emotional distress, we did not intend to revive the abolished torts of alienation of affections and criminal conversation. We believe the General Assembly intended to eliminate these common-law actions regardless of the title they are given or the severity of the alleged misconduct.

Although the third count of appellant's complaint is couched in terms of intentional infliction of emotional distress, it is clear that the complaint in truth and effect asserts an action for criminal conversation and alienation of affections. Central to appellant's claims is that his marriage to his former wife, who is not a party to this lawsuit, was harmed. Repeated throughout the complaint are references to the alleged sexual relationship between Pressnell and appellant's wife, the resulting harm to appellant's marriage, the eventual divorce, and the anguish, shock, nervousness, and depression associated therewith.[7]

These are the very allegations that the General Assembly intended to preclude from judicial consideration and review when it enacted R.C. 2305.29. The fact that appellant asserts a claim for intentional infliction of emotional distress does not remove this action from its true characterization as an amatory tort. As stated by Presiding Judge Hendrickson in his dissent in *Slusher* v. *Oeder, supra,* at 437-438, 16 OBR at 509, 476 N.E. 2d at 720: "[I]f the interests protected by the cause of action for alienation of affections [and criminal conversation] are no longer interests recognized and protected by law* * *, the resurrection of these interests under a different name is fallacious and improper."

Indeed, Ohio courts have repeatedly rejected attempts by a plaintiff to avoid the untoward effects of a legal bar by pleading alternative theories of recovery in lieu of the barred action.[8]

---

[7] When amatory actions were actionable in Ohio, the elements necessary to prove alienation of affections were that "the defendant wrongfully, maliciously and intentionally enticed, induced, persuaded and caused plaintiff's husband to lose his affections for * * * [his wife], and that defendant intended to bring about the alienation." *Trainor* v. *Deters* (1969), 22 Ohio App. 2d 135, 137, 51 O.O. 2d 258, 259, 259 N.E. 2d 131, 133; *Lewis* v. *Bauer* (1964), 93 Ohio Law Abs. 457, 29 O.O. 2d 144, 198 N.E. 2d 781.

Criminal conversation, on the other hand, was distinguished in that adultery was the all-important element and alienation of the spouse's affections was not a necessary element. "The fundamental right violated by criminal conversation is that of exclusive sexual intercourse, which the law grants as a necessary consequence of the marriage relation, and the actual marriage of the parties being admitted or established the cause of action is complete upon the allegation and proof of sexual intercourse between the defendant and the wife of plaintiff; * * *." *Baltrunas* v. *Baubles* (1926), 23 Ohio App. 104, 106, 154 N.E. 747.

[8] See, *e.g., Gillette* v. *Tucker* (1902), 67 Ohio St. 106, 65 N.E. 865; *Andrianos* v. *Community Traction Co.* (1951), 155 Ohio St. 47, 44 O.O. 72, 97 N.E. 2d 549; *Hibbett*

As we stated in *Andrianos* v. *Community Traction Co.* (1951), 155 Ohio St. 47, 44 O.O. 72, 97 N.E. 2d 549, at paragraph two of the syllabus: "* * * The limitation is imposed on the cause of action and the form in which the action is brought is immaterial."

Finally, other states that have abolished amatory actions agree that any attempt to recover for those actions under a different label is prohibited. See, *e.g., Goldberg* v. *Musim* (1967), 162 Colo. 461, 427 P. 2d 698; *Lund* v. *Caple* (1984), 100 Wash. 2d 739, 675 P. 2d 226; *Nicholson* v. *Han* (1968), 12 Mich. App. 35, 162 N.W. 2d 313; *Destafano* v. *Grabrian* (Colo. App. 1986), 729 P. 2d 1018.

Therefore, we hold that the torts of alienation of affections and criminal conversation, which were abolished by R.C. 2305.29, are not revived by the recognition of the independent tort of intentional infliction of emotional distress. See *McCutcheon* v. *Brooks* (1988), 37 Ohio App. 3d 110, 524 N.E. 2d 202.

### C

The final allegation made against Pressnell individually was that he owed a fiduciary duty of trust and confidence to appellant and that this duty was breached by fraud, misrepresentation, and nondisclosure by Pressnell.

A "fiduciary" has been defined as " 'a person having a duty, created by his undertaking, to act *primarily for the benefit of another* in matters connected with his undertaking.' " (Emphasis *sic.*) *Haluka* v. *Baker* (1941), 66 Ohio App. 308, 312, 20 O.O. 136, 138, 34 N.E. 2d 68, 70.

For the same reasons that inten-

tional infliction of emotional distress was not a viable action in the case at bar, an action for breach of a fiduciary duty is equally unwarranted. We agree with the trial court below that appellant's claim of damages for breach of a fiduciary duty is barred by R.C. 2305.29. As the trial court stated:

"Couching the claim as breach of fiduciary responsibility and fraud and misrepresentation designates the type of conduct that was allegedly employed, and, while such conduct can be morally reprehensible, it is not the conduct but the results of the conduct which are sought to be compensated, the result being estrangement of the spouse and implied sexual relations with the spouse. Such clearly falls within the preclusion of Section 2305.29 O.R.C. in reference to [a]lienation of [a]ffections and criminal conversation. * * *While the alleged conduct of defendant is reprehensible, this Court does not find it subject to a claim for damages under the statutory preclusion, R.C. 2305.29."

A claim of breach of a fiduciary duty is basically a claim of negligence, albeit involving a higher standard of care. And in negligence actions, we have long held that " 'one seeking recovery must show the existence of a duty on the part of the one sued not to subject the former to the injury complained of, a failure to observe such duty, and an injury resulting proximately therefrom.' " *Stamper* v. *Parr-Ruckman Home Town Motor Sales* (1971), 25 Ohio St. 2d 1, 3, 54 O.O. 2d 1, 2, 265 N.E. 2d 785, 786; *Baier* v. *Cleveland Ry. Co.* (1937), 132 Ohio St. 388, 391, 8 O.O. 208, 209, 8 N.E. 2d 1, 2.

v. *Cincinnati* (1982), 4 Ohio App. 3d 128, 4 OBR 220, 446 N.E. 2d 832; *Swankowski* v. *Diethelm* (1953), 98 Ohio App. 271, 57 O.O. 312, 129 N.E. 2d 182; *Steinmetz* v. *Lowry* (1984), 17 Ohio App. 3d 116, 17 OBR 179, 477 N.E. 2d 671; *National Car Rentals* v. *Allen* (1964), 1 Ohio App. 2d 321, 30 O.O. 2d 316, 204 N.E. 2d 554.

Indeed, a fundamental principle of the law of *all* torts is that a legal right must exist and that this right must be violated in order to warrant redress. "[T]here can be no redress for some claimed tortious act unless the party (or parties) sought to be charged was guilty of some act that the law regards as wrongful." Speiser, Krause & Gans, The American Law of Torts (1983) 34, Section 1:10.

Because R.C. 2305.29 abolished the torts of alienation of affections and criminal conversation, any legal right that a spouse may have had under these common-law actions has been abrogated and, thus, there can be no violation of a nonexistent right. Therefore, Pressnell is not liable for breach of fiduciary duty, fraud, misrepresentation, or nondisclosure.

### III

The final issue we address is whether the church can be held liable to appellant on either agency principles or for negligent supervision or training of Pressnell.

It is axiomatic that for the doctrine of *respondeat superior* to apply, an employee must be liable for a tort committed in the scope of his employment. Likewise, an underlying requirement in actions for negligent supervision and negligent training is that the employee is individually liable for a tort or guilty of a claimed wrong against a third person, who then seeks recovery against the employer. Because no action can be maintained against Pressnell in the instant case, it is obvious that any imputed actions against the church are also untenable.

Therefore, for the foregoing reasons, the judgment of the court of appeals is affirmed in part, reversed in part, and the decision of the trial court is reinstated.

*Judgment affirmed in part and reversed in part.*

MOYER, C.J., LOCHER and HOLMES, JJ., concur.

H. BROWN, J., concurs in the syllabus and judgment.

SWEENEY and DOUGLAS, JJ., dissent.

SWEENEY, J., dissenting. Inasmuch as the majority opinion misrepresents the prayer for relief urged by appellant and misinterprets the law governing this case I must respectfully dissent.

While I agree with the resolution of the "threshold question" by the majority, I must part company with its further disposition of the case because such disposition is as internally inconsistent as it is legally indefensible. The majority opinion begins the discussion by observing quite correctly that the conduct at issue in the case *sub judice* enjoys no First Amendment protection. It is self-evident that the tortious behavior alleged herein bears no relationship to the practice of legitimate religious beliefs. The conclusion that sexual relations between a counselor and his client do not constitute an accepted form of marital counseling is both conceded by appellees and acknowledged by the majority. Nevertheless, the majority eschews the imposition of a duty to refrain from such conduct because, it is alleged, to do so may "clash with the religious beliefs of some faiths and thus violate the Free Exercise Clause of the First Amendment to the United States Constitution."

Given that such conduct is unprivileged under the Constitution, it matters not whether it is practiced by a clergyman or a secular counselor. The

gravamen of the complaint is failure of the practitioner to measure up to the standards of the profession. Thus, to the question posed by the majority regarding whether "the cleric [should] be held to the same duty of care as secular counselors," I would respond in the affirmative. This result is compelled by focusing on the behavior of the practitioner and not his religious or secular status. The method by which each would be qualified to perform his respective functions is wholly immaterial under the facts of this case since, in either situation, sexual relations have never been an accepted mode of treatment. Thus, I feel compelled to remind the majority that its repeated reference to the "facts of this case" undermines its incessant hypothesizing about situations where religious and secular methods of marriage counseling may diverge. "Under the facts of this case," either regimen would reject sexual relations as a viable treatment technique.

In order to give credence to this false distinction, the majority has apparently decided to indulge in the assumption that formal certification of a profession is a condition precedent to the institution of a suit for malpractice. This view is devoid of merit. An action for malpractice is wholly separate from any disciplinary proceeding instituted against a member of a profession. Moreover, the notion advanced by the majority that malpractice is a species of legal recourse conceptually different from common-law negligence would doubtless be a startling discovery to the bench and bar. While professionals of all types are held to the standards of their respective professions, the liability rules governing their behavior do not diverge significantly from those imposed upon laymen. In short, malpractice is nothing more than professional negligence and it matters not whether formal standards have been established for the profession by regulatory agencies or professional societies.[9]

It is therefore not altogether clear what the majority is attempting to convey by its observation that "[a] tortfeasor may be liable for acts of ordinary negligence or for intentional torts, regardless of the 'professional' color of his conduct." If, by this statement, the majority wishes to observe that a professional will be held liable for negligence separate from any negligence arising from the exercise of his professional skills, the observation is nothing more than a *non sequitur*. Obviously, the counselor-client relationship is the basis of the cause of action. It is because of this special relationship that liability results. The standard of care applicable to the relationship exists irrespective of any liability resulting from the negligent performance of acts arising in a context unrelated to the fulfillment of professional responsibilities.

I would therefore hold that a marriage counselor who engages in sexual relations with the spouse of a client seeking professional guidance may be answerable in damages for malpractice.[10]

---

[9] In this regard, see Prosser & Keeton on Torts (5 Ed. 1984) 185, Section 32, wherein it was observed that an action in malpractice may be pursued against "milk haulers, hockey coaches, expert skiers, [and] construction inspectors." It is therefore evident that persons need not be members of a licensed "profession" in order to be held liable for professional negligence.

[10] Clergy malpractice, therefore, is a misnomer. The standard of behavior below which such actions fall does not vary be-

I likewise disagree with the majority's rejection of the cause of action asserted by appellant that is founded upon intentional infliction of emotional distress. The disposition of this issue is flawed in numerous respects. As an initial matter it is necessary to respond to the consideration of the constitutionality of R.C. 2305.29. While the majority is correct in observing that the constitutionality of R.C. 2305.29 has not been previously addressed by this court, it is grossly in error when it chooses, *sua sponte,* to pass upon the issue today. The reason for this conclusion is simple. Nowhere in the complaint filed by appellant or in his arguments before this court has the constitutionality of R.C. 2305.29 been challenged. The rationale behind this omission is likewise simple. The present action is not predicated upon the theories of recovery abolished by R.C. 2305.29. Consequently, the reliance by the majority upon R.C. 2305.29 is wholly without foundation.[11] Nevertheless, the opinion blithely re-writes the complaint, converts it into a prayer for relief founded upon claims abolished by R.C. 2305.29 and then rejects the reconstituted claims as statutorily barred.

In point of fact, this action is not "in truth and effect" an action for alienation of affections. Rather, it is a cause of action founded upon intentional infliction of emotional distress as recognized by *Yeager* v. *Local Union 20* (1983), 6 Ohio St. 3d 369, 6 OBR 421, 453 N.E. 2d 666. The majority seeks to distinguish *Yeager* by stating that it did not involve facts which would have given rise to a cause of action in alienation of affections at common law. This analysis, however, ignores the observation contained in *Yeager* that decisions predating that case had recognized the existence of a cause of action for intentional infliction of emotional distress where a special relationship existed between the plaintiff and defendant.[12] In fact, the special relationship existing between Pressnell and appellant in the instant action is what distinguishes this case from a common amatory action. As noted in Prosser & Keeton on Torts (5 Ed. 1984) 64-65, Section 12:

"In the great majority of the cases allowing recovery the mental distress has been inflicted intentionally, the defendant either desiring to cause it or knowing that it was substantially certain to follow from the conduct. There are, however, a few cases which indicate that liability for extreme outrage is broader and extends to situations in which there is no certainty, but merely a high degree of probability that the mental distress will follow, and the defendant goes ahead in conscious disregard of it. * * * [T]he category of extreme outrage is to be extended to include conduct not intended to cause mental disturbance, but wilful, wanton or reckless in its deliberate disregard of a known high degree of risk of it."

This is precisely the situation presented by the case at bar. Appellant

---

tween religious and secular counselors. In either case, where damages foreseeably result from and are proximately caused by such negligence, liability for such damages may be recovered by the injured party. See *Rowe* v. *Bennett* (Me. 1986), 514 A. 2d 802.

[11] The identity of the challengers to the constitutionality of R.C. 2305.29 remains a mystery. It can be stated with certainty that these phantom advocates are not parties to the present litigation.

[12] See *Yeager* v. *Local Union 20* (1983), 6 Ohio St. 3d 369, 373, 6 OBR 421, 425, 453 N.E. 2d 666, 670, fn. 2.

and his wife sought counseling from Pressnell in order to overcome their marital problems. Not only was Pressnell aware that such problems existed, but he was consulted for those very problems. Armed with this knowledge and cognizant of the great emotional strain and vulnerability experienced by his clients at that time, it is alleged that Pressnell sought not to remedy the situation but rather to exploit his position in order to obtain sexual gratification. Given Pressnell's knowledge and experience, there exists a jury question as to whether he intentionally sought to inflict emotional harm upon appellant or consciously disregarded a known risk that such harm would result.

The aforementioned special relationship between appellant and Pressnell is also what gives rise to a cause of action for breach of fiduciary duty. The majority, although inadvertently, sets forth the appropriate standard in ascertaining the duties of a fiduciary. It was correctly stated that a fiduciary is " 'a person having a duty, *created by his undertaking,* to act primarily for the benefit of another in matters connected with his undertaking' [quoting *Haluka* v. *Baker* (1941), 66 Ohio App. 308, 312, 20 O.O. 136, 138, 34 N.E. 2d 68, 70]." (Emphasis added.) This is precisely the situation in the case at bar. Pressnell enjoyed a position of trust "created by his undertaking" (*i.e.,* his position as a marriage counselor). But for Pressnell's professional status, appellant and his wife would not have sought his guidance.

As eloquently stated by Judge Cacioppo of the court of appeals in her concurrence and dissent below:

"* * * [T]his case does not resemble your garden variety seduction scenario. The wife did not get involved with the milkman, the mailman or the guy next door. Here, the couple's minister, under guise of offering pastoral counseling services, abused the trust placed in him. This trust was the *raison d'etre* of the relationship. It is also what distinguishes this case from those which the legislature intended to abolish when it did away with amatory actions. This distinction also applies to Strock's claim of misrepresentation — this was not your average lover's ruse."

In its zeal to foreclose a remedy for the harm suffered by appellant, the majority apparently oscillates between alternative and conflicting descriptions of the actions of Pressnell so as to achieve pre-ordained results. In rejecting claims founded upon malpractice and breach of fiduciary duty, the majority contends that these bases of recovery sound in professional misconduct and negligence,[13] respectively, while the "amatory" behavior at issue in the case at bar constitutes purposeful conduct. Yet the majority also concludes that the cause of action founded upon intentional infliction of emotional distress is foreclosed by the abolishment of amatory actions contained in R.C. 2305.29. This disposition is reached despite the majority's reliance upon Prosser & Keeton, *supra,* at 929, Section 124, wherein it was stated that "such torts [as are encompassed within amatory actions] seldom are committed with deliberate plan [, *i.e.,* are intentional in nature]."

Thus, Pressnell's acts are deemed to be intentional when considering a cause of action sounding in negligence and misconduct but nevertheless do

---

[13] It is interesting to discover that the majority apparently views the conscious act of a trustee in appropriating trust funds for his own use such as to give rise to a claim for breach of fiduciary duty to be negligent rather than intentional in nature.

not give rise to an action for intentional infliction of emotional distress because, it is alleged, they are encompassed within amatory actions which the majority appears to concede are based in negligence. Such is the inevitable result of the majority's futile attempt to pigeonhole causes of action at the pleading stage. Recovery under any of the causes of action alleged by appellant are largely dependent upon the facts adduced at trial. The breach of fiduciary duty may be the result of either a negligent or intentional act. Such acts may constitute behavior below the standard of care associated with a particular profession such as to give rise to a cause of action in malpractice. Such acts, when committed with intent to harm or with knowledge that such harm is substantially certain to occur, may give rise to a cause of action for intentional infliction of emotional distress. Whether any or all of these theories of recovery are supported by the facts necessarily requires a trial on the merits — an opportunity foreclosed to appellant by today's decision. At least since the advent of the Civil Rules, a litigant was not obligated to confine his pleadings to a single theory of recovery.[14] Regrettably, the result of today's decision is to countenance the type of behavior alleged by appellant to have occurred and to foreclose the availability of a legal remedy therefor under *any* theory of recovery.

DOUGLAS, J., concurs in the foregoing dissenting opinion.

_____

[14] See Civ. R. 2.