518 So.2d 682 (1987)
Tommy HANDLEY, as Administrator Ad Litem of the Estate of Bobby Glenn Handley, Deceased
v.
James B. RICHARDS and Brenda Handley Richards.
85-841.
Supreme Court of Alabama.
September 4, 1987.
Rehearing Denied January 15, 1988.
*683 George M. Barnett, Guntersville, Bennett L. Pugh and J. Zach Higgs, Jr. of Higgs & Conchin, Huntsville, for appellant.
David H. Meginniss of Hornsby, Blankenship, Robinson & Meginniss, Huntsville, for appellees.
PER CURIAM.
The trial court's order, pursuant to Rule 12(b)(6), A.R.Civ.P., dismissing plaintiff's action for failure to state a cognizable claim, is affirmed
AFFIRMED.
JONES, ALMON, SHORES, BEATTY, HOUSTON, ADAMS and STEAGALL, JJ., concur.
TORBERT, C.J., and MADDOX, J., concur specially.
MADDOX, Justice (concurring specially).
I agree completely that the judgment of the trial court should be affirmed, but because this case presents an issue never before decided in this state, I take this opportunity to express the reasons for my concurrence in the affirmance of the lower court's judgment.
This is a wrongful death case arising out of a suicide, allegedly caused by a minister's malpractice or "outrageous conduct" during counseling. The trial court entered a judgment in favor of the defendant, and the administrator of the deceased's estate appealed.
Bobby Lynn Handley, later replaced by Tommy Handley as administrator ad litem of the estate of Bobby Glenn Handley, filed this wrongful death action against Brenda Handley Richards and James B. Richards, alleging that Bobby Glenn Handley committed suicide because of the outrageous conduct and "clerical malpractice" of the defendant. Plaintiff claimed that Bobby Glenn Handley and his then-wife, Brenda Handley Richards, were experiencing marital problems, and had sought the counseling of defendant James B. Richards, their minister. Plaintiff alleges that while defendant James B. Richards was counseling Bobby Glenn Handley and Brenda Handley Richards, defendant James B. Richards and defendant Brenda Handley Richards were deeply involved in a sexual affair, and that as the marriage counseling continued, Brenda Handley Richards was attempting to procure a divorce from Bobby Glenn Handley. "[T]he plaintiff claims that the emotional toll of this marital tribulation combined with the deceitful manner of the counseling by James B. Richards caused [Bobby Glenn Handley] to take his life," and that the deceased's death resulted as a "proximate consequence of the outrageous conduct of the defendant, James B. Richards...."
Plaintiff amended his complaint, incorporating the same facts as alleged in the original complaint, and further averred that as a result of the mental strain upon Bobby Glenn Handley by the conduct of defendant Brenda Handley Richards, that Bobby Glenn Handley had attempted suicide by overdose of drugs, whereupon he was admitted to the psychiatric ward of a Huntsville hospital. Plaintiff claimed that Bobby Glenn was released against medical advice upon the demands of Brenda Handley Richards, and that Bobby Glenn thereafter committed suicide by hanging.
The issues on this appeal are whether the plaintiff stated a cause of action against the minister, James B. Richards, for clergyman malpractice and whether he stated a cause of action for the tort of "outrageous conduct." I agree with the majority that he did not.

I
I have been able to locate only two cases from other jurisdictions that discuss the liability of a minister for alleged clergyman malpractice in conducting pastoral counseling. The first case to advance the theory of clergyman malpractice, insofar as I am aware, was Nally v. Grace Community Church of the Valley, 157 Cal.App.3d 912, 204 Cal.Rptr. 303 (1984). The other case is Hester v. Barnett, 723 S.W.2d 544 (Mo. App.1987), a case not cited by either party on appeal.
*684 Nally involved a suit by parents against a church and its pastors for the alleged wrongful death of their son, who committed suicide after counseling by the pastors. In that case, the parents alleged that their son had become depressed after a rift with his girlfriend, and that shortly afterward, he converted from Catholicism to Protestantism and became a communicant of the Grace Community Church, a fundamentalist sect. The boy attended a Bible institute at the church and counseled with the pastors frequently to discuss his problems with the girlfriend and with his family. His depression deepened, and, at the request of his mother, he consulted a physician, who placed him on antidepressant medication. Nally attempted suicide, and was hospitalized. Nally stayed at the home of one of the pastors after his release, to avoid tensions at home, and refused to keep psychiatric appointments because he believed psychiatrists were not Christians and would not be able to help him. A few days later, he committed suicide. A divided court authorized the action to be maintained in Nally. Nally is questionable authority. The California Supreme Court ordered that the opinion be "decertified" and be given publication without official status. Nally v. Grace Community Church of the Valley, 157 Cal. App.3d 912, 204 Cal.Rptr. 303 (1984).
After remand, and at the trial, the Nally parents proceeded on the theory of clergyman malpractice for negligent counseling, and at the close of the presentation of that evidence the trial court granted a motion by the defendant church and its pastors for a nonsuit on the ground that to authorize a cause of action would violate the first amendment of the Constitution of the United States. A review of the judgment of nonsuit still is pending.[1]
In Hester v. Barnett, a husband and wife brought an action against the clergyman in which they alleged defamation, ministerial malpractice, alienation of affections, intentional infliction of emotional distress, invasion of privacy, and interference with contract. The trial court granted the minister's motion to dismiss, and on appeal the Missouri Court of Appeals held that: (1) Even assuming the existence of a clergyman malpractice remedy for negligent counseling, the allegation that the minister "acted contrary to ministerial ethics and against Missouri Law ... and against the standard of conduct imposed upon ministers of the gospel" did not allege a cause of action; (2) The plaintiff did state a cause of actionspousal alienation of affections; (3) There was a justiciable claim for defamation; (4) The complaint sufficiently pleaded a tort of unreasonable intrusion upon the seclusion of another; (5) The complaint pleaded a cause of action for a tortious interference with contract; and (6) The allegations of the complaint described secular conduct and hence stated a cause of action outside the scope of the Free Exercise Clause of the First Amendment.
Based on the same reasoning used by the Court in Hester v. Barnett, I believe that plaintiff's original complaint in this case failed to state a cause of action against the minister.
In Hester v. Barnett, the court wrote:
"The plaintiffs acknowledge that ministerial malpractice is a tort not known in Missouri law. They argue that the allegations of the petition, that the minister disclosed confidential communications from the Hesters, alienated the affections of the Hester family members, interfered with the business relationship between the Hesters and their farm employees, defamed the Hesters from the pulpit and otherwise in public, invaded their privacy and inflicted intentional emotional distress upon them, all bespeak breaches of a professional standard of care, and hence are suitable for redress by the malpractice remedy.
"The term malpractice means professional misconduct. Black's Law Dictionary, p. 864 [5th ed. 1979]. It means `the failure to use that degree of skill and learning ordinarily used under the same or similar circumstances by members of *685 [that] profession.' MAI 11.06 [3d ed. 1981]; see also Restatement (Second) of Torts § 299A (1965). It means, by very definition, the breach of a professional duty unique to that profession. 1 Mo. Tort Law [Mo.Bar 1985], § 1.6 [Medical Malpractice]; § 2.1 [Attorneys Malpractice]; § 2.30 [Insurance Agents and Brokers Malpractice]. Malpractice, therefore, is not a theory of ordinary negligence or of intentional tort. The ordinary negligence or intentional tort of any person is already actionable, regardless of its `professional' color. Thus, also, a cleric is amenable to suit for alienation of affections albeit guised as a religious practice, for assault and battery committed during a religious service, for a malicious prosecution of parents informed against by the cleric for child abuse, for the obtention of donations of money by fraud, and for other incidences of intentional tort in the exercise of the religious duty.
"To avoid a redundant remedy, therefore, any functional theory of clergy malpractice needs address incidents of the clergy-communicant relationship not already actionable. The duties of a clergyman most nearly approximate to an existent professional practice, and hence most accountable to minimum professional standards [preeminent commentators agree], include that of spiritual counseling: the advice a member of the clergy renders to meet the spiritual, emotional, and religious needs of the communicant. These authorities agree alsoand that, whether they favor or disfavor the clergy malpractice remedythat the validity of such a tort cause of action is most typically articulated in terms of the pastoral counseling function. The only reported case in which the petition presented the theory of clergy malpractice in terms of negligent counsel and spiritual advice leaves unresolved the question whether such a petition is justiciable.
"* * *
"The intentional torts of a cleric are already actionable, however, even though incidents of religious practice and belief. Bear v. Reformed Mennonite Church, 462 Pa. 330, 341 A.2d 105 (1975); Carrieri v. Bush, 69 Wash.2d 536, 419 P.2d 132 (1966). See also Radecki v. Schuckardt, 50 Ohio App.2d 92, 361 N.E.2d 543 (1976). Liability for such conduct does not clash with the free exercise clause of the First Amendment because conduct albeit promoted by religious belief is subject to regulation for the protection of society. That is the clear sense of Cantwell v. State of Connecticut, 310 U.S. 296, 60 S.Ct. 900, 84 L.Ed. 1213 (1940) at 303, 60 S.Ct. at 903:
"`The First amendment declares that Congress shall make no law respecting an establishment of religion or prohibiting the free exercise thereof. The Fourteenth Amendment has rendered the legislatures of the states as incompetent as Congress to enact such laws. The constitutional inhibition of legislation on the subject of religion has a double aspect. On the one hand, it forestalls compulsion by law of the acceptance of any creed or the practice of any form of worship.... On the other hand, it safeguards the free exercise of the chosen form of religion. Thus, the Amendment embraces two concepts,freedom to believe and freedom to act. The first is absolute but, in the nature of things, the second cannot be. Conduct remains subject to regulation for the protection of society.' [emphasis added]
"Sherbert v. Verner, 374 U.S. 398, 83 S.Ct. 1790, 10 L.Ed.2d 965 (1963) confirmed that whereas `the door of the free exercise clause stands tightly closed against religious beliefs as such,' overt acts prompted by religious beliefs are not free from governmental regulation where the actions `posed some substantial threat to public safety, peace or order.' Id. at 402-403, 83 S.Ct. at 1792-1793.
"* * *
"The viability of a clergy malpractice remedy for negligent counseling, nevertheless assumed, the petition brought by the Hesters as Count I does not allege *686 the tort. That count pleads the sequence from the outset of the self-introduction by Pastor Barnett to the Hesters as a minister of the Baptist Church, his invitation to them to trust and confide in him, and his assurances that their confidences would not be divulged outside the family. The count then pleads the disclosure to the pastor of the behavioral problems of the three Wymer children, the invitation by the pastor to counsel the family to relieve the problems, the acceptance by the Hesters, and the breach of that confidence by the divulgence by Pastor Barnett to third persons of the confidences disclosed during counseling. The rest of the averments of Count I assert the state of mind which prompted the disclosures: that Pastor Barnett deliberately misrepresented to others the content of the Hester communications with himand instructed the Wymer children to lie to others about the nature of the parental discipline `so that the children would eventualy [sic] be removed from plaintiffs' home,' and [to that end?] `began a crusade and course of action which is continuing today and which is designed to defame plaintiffs in the community where they live, denouncing them as irreligious and abusive parents.' These allegations of intentional disclosure of the confidential communications reposed in him during the family counseling, the animus which prompted them, and the malicious purposes intended, are all iterated as separate counts in terms of established intentional torts: defamation, alienation of affections, invasion of privacy, and the intentional infliction of emotional distress. These torts, however, do not depend for validity upon a standard of professional conduct found, imposed and breached [that is, a malpractice], but upon the duty the law imposes on every person to avoid injury to another.
"What remains of the Count I as a pleading of clergy malpractice is the allegation that the defendant Barnett
"`acted contrary to ministerial ethics and against Missouri law in particular Section 491.060(H)[sic, actually § 491.060(4), RSMo Cum.Supp.1987] and against the standard of conduct imposed upon ministers of the gospel....'
"It is the sense of that pleadingthe Hesters expound in argumentthat § 491.060(4), which renders a clergyman incompetent to testify concerning a communication made to him in the professional character as spiritual advisor, imposes a `minimum standard for the profession,' whose nonobservance constitutes both a malpractice and a breach of professional ethics. While the statute no doubt means to encourage an effective relationship between the spiritual advisor and the communicant, the enactment has no effect beyond its actual terms. State v. Kurtz, 564 S.W.2d 856, 860[10] (Mo. banc 1978). There is no intimation that § 491.060(4) intends any effect beyond a judicial proceedinglet alone a cause of action for the breach. The privilege, moreover, was not known at the common law, and hence the pleading cannot be understood to invoke any tort principle of that system of law to validate a malpractice action for its breach. State v. Kurtz, 564 S.W.2d at 860[10]; C. McCormick, Evidence § 72 (3d ed. 1984). The tradition that a spiritual advisor does not divulge communications received in that capacity, moreover, even if a tenet of `ministerial ethics' as Count I pleads, describes a moral, not a legal duty. In the absence of a legal duty, a breach of a moral duty does not suffice to invest tort liability. T. Cooley, Law of Torts § 3 (4th ed. 1932); J. Dooley, Modern Tort Law § 2.01, at 8 (1982 rev.); Restatement (Second) of Torts, §§ 4 and 5 (1965); Linville v. Ripley, 237 Mo.App. 1275, 173 S.W.2d 687, 690[5-8] (1943).
"Count I does not allege a cause of action for clergy malpractice for negligent counseling, and was properly dismissed."
For a full discussion of the tort of clergyman malpractice, see Funston, Made out of Whole Cloth? A Constitutional Analysis of the Clergyman Malpractice Concept, 19 Cal.W.L.Rev. 507 (1983); Ericsson, Clergyman Malpractice: Ramifications of a *687 New Theory, 16 Val.L.Rev. 163, 166 (1981); Szasz, The Theology of Therapy: The Breach of the First Amendment Through the Medicalization of Morals, 5 N.Y.U. Rev. of Law and Social Change (1975); Bergman, Is the Cloth Unraveling? A First Look at Clergy Malpractice, 9 U.San Fern.V.L.Rev. 47 (1981).

II
The second legal question is whether the plaintiff alleged a cause of action for "outrageous conduct" as defined in American Road Service Co. v. Inmon, 394 So.2d 361 (Ala.1981). I do not think so.
As pointed out in Hester v. Barnett, the intentional torts of a minister can be actionable, and I believe Alabama would follow a similar course, but under the facts of this case plaintiff has failed to state facts to show that the minister was guilty of "outrageous conduct."

III
Based on the foregoing, I agree that the original complaint against the minister, James B. Richards, fails to state a claim for clergyman malpractice or "outrageous conduct."
TORBERT, C.J., concurs.
NOTES
[1] The chronicle of the lawsuit is reported by counsel for the Nally parents in Barker, Clergy Negligence: Are Juries Ready to Sit in Judgment?, Trial (July 1986).