940 So.2d 247 (2006)
M. Floyd BAILEY, Jr.
v.
James H. FAULKNER III.
1040880.
Supreme Court of Alabama.
January 6, 2006.
Rehearing Denied April 21, 2006.
*248 Daniel S. Wolter of Gaines, Wolter & Kinney, P.C., Birmingham; and Jeffrey W. Smith of Slaten & O'Connor, P.C., Montgomery, for appellant.
Randy Myers and Frank H. Hawthorne, Jr., of Hawthorne & Myers, LLC, Montgomery, for appellee.
WOODALL, Justice.
M. Floyd Bailey, Jr., appeals from a judgment entered on a jury verdict in favor of James H. Faulkner III in Faulkner's action against Bailey arising out of a consensual, sexual relationship between Bailey and Paris Faulkner, who, at the time of that relationship, was Faulkner's wife. We reverse and remand.

I. Factual Background
In December 1999, the Faulkners were attending the Dalraida Church of Christ in Montgomery ("Dalraida"). Bailey, who has a bachelor of arts degree in Bible from Faulkner University, was Dalraida's pastor. At that time, the elders of Dalraida hired Paris to serve as the church secretary. The job responsibilities of the secretary and the pastor occasioned frequent personal interaction between Paris and Bailey.
Bailey soon discovered that the Faulkners were engaged in marriage counseling with Dr. Terry Gunnels, a licensed counselor. In March 2000, Bailey began advising the Faulkners regarding their marital problems, and they discontinued their counseling sessions with Dr. Gunnels. According to James Faulkner, Bailey "assured" them that "he could spend a lot more time with [them] than [Dr.] Gunnels," and "guaranteed" them that "he could fix [their] marriage." That same month, Bailey and Paris secretly began a consensual, sexual relationship that lasted until July 2000.
In April 2000, Bailey learned that James had been offered employment in Baldwin County and that Paris did not want to move. Bailey urged James to decline the job offer, saying that the move "could break [the Faulkners'] marriage." James took Bailey's advice and declined the offer.
The relationship ended after James discovered it and confronted Paris and Bailey. After initially denying his involvement with Paris, Bailey eventually admitted it and resigned as pastor of Dalraida. Paris unsuccessfully sought reconciliation with James, who initiated divorce proceedings. The Faulkners were divorced on January 4, 2001.
On February 5, 2002, Faulkner sued Bailey. The complaint stated, in pertinent part:
"7. Defendant M. Floyd Bailey, Jr., while acting within the line and scope of his employment with [Dalraida], assumed the duty to counsel [Faulkner], and his wife at the time, concerning their marriage.
"8. Defendant M. Floyd Bailey, Jr., while acting within the line and scope of his employment with [Dalraida], negligently [and/or wantonly] performed said duties.
"9. As a proximate result of such negligence [and/or wantonness], Plaintiff James H. Faulkner, III, was damaged by the failure of his marriage and he has suffered extreme *249 mental anguish as a result thereof."
(Emphasis added.)
The negligence and wantonness claims were tried before a jury. During the trial, Bailey filed timely motions for a judgment as a matter of law ("JML"). He argued, among other things:
"[I]t is clear from the testimony [that] this is . . . a case of alienation of affection. It is couched in terms of negligent counseling to try to formulate a lawsuit. The testimony has been that Mr. Faulkner's damage was because of the affair. He said [he was] damaged because [Paris and Bailey] had the affair and it led to [his] divorce, which is the exact definition of alienation of affection."
The trial court denied those motions and instructed the jury on negligence and wantonness. The jury was instructed on compensatory damages, including damages for mental anguish, and on punitive damages. The jury awarded $67,000 compensatory damages and $2,000,000 punitive damages. After the trial, Bailey renewed his motion for a JML and, alternatively, moved for a new trial or a remittitur. The trial court reduced the punitive-damages award to $1,617,000, pursuant to Ala.Code 1975, § 6-11-21(d) and (f), but otherwise denied Bailey's postjudgment motion.
Bailey appealed. On appeal, he contends, among other things, that he is entitled to a JML, because, he argues, the claims Faulkner asserted at trial are, in substance, a claim of "alienation of affections," which, he argues, is not a cognizable theory of recovery under Alabama law. Alternatively, he argues that he provided the Faulkners "ministerial counseling," and that Faulkner's claims essentially allege "clergy malpractice," a cause of action that, Bailey insists, Alabama does not recognize. Faulkner contends that his claims allege negligent or wanton "marital counseling," which, he argues, is a cognizable cause of action in Alabama. We deem the dispositive issue to be whether Faulkner's claims amount to, in reality, a claim of alienation of affections traveling under the guise of negligent or wanton marital counseling.[1]

II. Discussion
The standard by which we review a ruling on a motion for a JML is "`materially indistinguishable from the standard by which we review a summary judgment.'" Flint Constr. Co. v. Hall, 904 So.2d 236, 246 (Ala.2004) (quoting Hathcock v. Wood, 815 So.2d 502, 506 (Ala.2001)). Thus, the standard of review is de novo. See Story v. RAJ Props., Inc., 909 So.2d 797, 801 (Ala.2005); House v. Jefferson State Cmty. College, 907 So.2d 424, 426-27 (Ala.2005); and Crutcher v. Wendy's of North Alabama, Inc., 857 So.2d 82, 85 (Ala.2003).
Bailey contends that the purported negligent/wanton-counseling claims "are really claims for alienation of affections and therefore barred by Ala.Code § 6-5-331 (1975)." Bailey's brief, at 25. "[T]he so-called `heart balm' or amatory torts," Doe v. Moe, 63 Mass.App.Ct. 516, 521, 827 N.E.2d 240, 245 (2005), were abolished by § 6-5-331, Ala.Code 1975, which provides: "There shall be no civil claims for alienation *250 of affections, criminal conversation, or seduction of any female person of the age of 19 years or over."
"The gist of an alienation of affections action is the intentional or purposeful. . . . interference with the marriage relationship." D.D. v. C.L.D., 600 So.2d 219, 222 (Ala.1992) (emphasis added). "An action for alienation of affection permitt[ed] recovery for `loss of consortium, humiliation, shame, mental anguish, loss of sexual relations, and the disgrace the tortious acts of the defendant have brought.'" Andrews v. Gee, 599 F.Supp. 251, 253 (D.S.C.1984) (quoting Scott v. Kiker, 59 N.C.App. 458, 462, 297 S.E.2d 142, 146 (1982)). See also Parker v. Newman, 200 Ala. 103, 75 So. 479 (1917). Another element of damage is pecuniary loss, such as loss of income. Heist v. Heist, 46 N.C.App. 521, 265 S.E.2d 434 (1980). Additionally, "punitive damages [could] be recovered for the tort of alienation of affections." Nelson v. Jacobsen, 669 P.2d 1207, 1219 (Utah 1983); see also Bland v. Hill, 735 So.2d 414, 420-21 (Miss.1999); and Oddo v. Presser, 158 N.C.App. 360, 367, 581 S.E.2d 123, 129 (2003), reversed on other grounds, 358 N.C. 128, 592 S.E.2d 195 (2004).
Since the abolition in Alabama of the heart-balm torts, this Court has refused to recognize "any claim for damages against a third party, no matter how denominated, that is based on allegations of interference with the marriage relationship." D.D., 600 So.2d at 223 n. 5 (emphasis added). For example, in D.D., this Court affirmed a summary judgment for the paramour and against the husband in his action against his wife's paramour for interfering with, and causing the dissolution of, his marriage. 600 So.2d at 221.
The husband's action purported to state claims of (1) abuse of process, (2) invasion of privacy, (3) negligence, (4) wantonness, and (5) intentional infliction of emotional distress.
"Specifically, the abuse of process claim [was] based on allegations that the third party [had] conspired with the wife to use the divorce action to establish that the husband was not the biological father of the child for the purpose of `depriving him of his . . . constitutionally protected liberty interest in his relationship with [the child]'; the invasion of privacy claim [was] based on allegations that the third party [had] `made repeated telephone calls to [the husband and wife's] residence for the purpose of interfering with [the husband's] effort to preserve the integrity of his family'; the negligence and wantonness claims [were] based on allegations that the third party, after being told by his psychotherapist that his relationship with the wife was detrimental to the husband's physical and mental well-being, [had] `persisted and continued to contact [the husband and wife's home]'; and the claim alleging intentional infliction of emotional distress [was] based on allegations that the third party [had undertaken] and pursued a `sustained course of conduct to disrupt and destroy the integrity of [the husband's] family . . . 1) by refusing [the husband's request] that he stop seeing and contacting [the wife and persisting in] his meetings and telephone conversations with [the wife,] while falsely representing to [the husband] . . . that his purpose for continuing the relationship with [the wife] was . . . to see if [the third party and the husband] could keep [their respective] family units together . . . 2) by having clandestine meetings with [the wife] in shopping center parking lots, public parks and other places . . . 3) by telephoning and otherwise making contact with [the wife without the husband's *251 knowledge] . . . 4) by [threatening] to [get a] divorce and [to marry the wife] if [the husband interfered with his relationship with the wife] . . . 5) by secretly . . . having genetic blood tests performed on himself, on [the wife], and on the child . . . 6) by lying to [the husband as to whether blood tests had been performed] . . . 7) by concealing from [the husband] his licentious relationship with [the wife] and the possibility [that] he [the third party] was [the child's] biological father . . . and 8) by surreptitiously forming [a partnership] with the wife . . . to conceal [the fact that he had purchased a house for her].'"
600 So.2d at 221-22 (footnote omitted). Although the complaint was conspicuously devoid of any claim denominated as an amatory claim, this Court held that each of the husband's claims was "based on allegations that he [was] entitled to damages as a result of the third party's interference with his marriage"; was, "in effect, one alleging alienation of affections"; and was, therefore, "barred by § 6-5-331." 600 So.2d at 222-23 (emphasis added).
Other courts have held that a husband's claim of negligent marital counseling or clergy malpractice, based on allegations that his wife and the minister or marriage counselor had engaged in sexual misconduct under the auspices of a counselor-counselee relationship, was merely a restyled alienation-of-affections claim, for which no relief was afforded. Strock v. Pressnell, 38 Ohio St.3d 207, 527 N.E.2d 1235 (1988); Gasper v. Lighthouse, Inc., 73 Md.App. 367, 533 A.2d 1358 (1987); and Lien v. Barnett, 58 Wash.App. 680, 794 P.2d 865 (1990) ("gravamen" of congregant's action alleging negligent counseling and pastoral malpractice was alienation of affections).
In Strock, for example, Richard Strock and his wife, Suzanne, sought marital counseling from "James Pressnell, minister of the Shepherd of the Ridge Lutheran Church." 38 Ohio St.3d at 208, 527 N.E.2d at 1236. During the counseling period, Pressnell and Suzanne "engaged in consensual sexual relations." Id. After Richard discovered the relationship, he divorced Suzanne and sued Pressnell asserting claims of "clergy malpractice, breach of a fiduciary duty, fraud, misrepresentation, nondisclosure, and intentional infliction of emotional distress." Id. The trial court dismissed the action on the ground that it was barred by Ohio Revised Code § 2305.29, "the statute that abolished amatory actions." 38 Ohio St.3d at 208, 527 N.E.2d at 1237. The Ohio Supreme Court agreed with the trial court.
The court regarded as "[c]entral to [Strock's] claims . . . [the allegation] that his marriage to his former wife . . . was harmed," and "the anguish, shock, nervousness, and depression associated therewith." 38 Ohio St.3d at 215, 527 N.E.2d at 1242. The court said: "These are the very allegations that the General Assembly intended to preclude from judicial consideration and review when it [abolished the amatory torts]." Id. Significantly, the court at first rejected the validity of the clergy-malpractice claim, on the ground that malpractice is not an "intentional tort." 38 Ohio St.3d at 211-12, 527 N.E.2d at 1239. Because "the alleged acts of Pressnell fell within the realm of intentional tort law, i.e., amatory actions," the court concluded, "the tort of clergy malpractice [could] not be applied to the facts found in [that] case." 38 Ohio St.3d at 212, 527 N.E.2d at 1239-40 (emphasis added).
The conclusion in Strock that a husband's allegations of consensual sexual misconduct between his wife and a pastor arising out of the counselor-counselee relationship do not sound in negligence is *252 consistent with D.D., supra. This is so, because, of course, the "gist of a malpractice action is negligence," Baylor v. Jacobson, 170 Mont. 234, 239, 552 P.2d 55, 58 (1976); Harris v. Grizzle, 625 P.2d 747, 749 (Wyo.1981); and Hayward v. Valley Vista Care Corp., 136 Idaho 342, 350, 33 P.3d 816, 824 (2001), whereas the intentional or purposeful "interference with the marriage relationship" is the "[t]he gist of an alienation of affections action." D.D., 600 So.2d at 222. See also Gibson v. Frowein, 400 S.W.2d 418, 421 (Mo.1966); and American Mfrs. Mut. Ins. Co. v. Morgan, 147 N.C.App. 438, 443-44, 556 S.E.2d 25, 29 (2001) ("when a defendant engages in conduct that is sufficient to constitute alienation of affection or criminal conversation tort actions, intent to injure the marriage and the non-consenting spouse may be inferred, as a matter of law"). Thus, it is immaterial whether Faulkner purports to allege negligent ministerial counseling, i.e., clergy malpractice, as Bailey insists, or negligent marital counseling, as Faulkner characterizes his claim. Neither theory is valid under the facts of this case.
This is so, because, despite the allegation in the complaint that Bailey "negligently [and/or wantonly]" counseled "[Faulkner] and his wife . . . concerning their marriage," Faulkner's actual theory of the case is that Bailey's illicit relationship with Paris destroyed his marriage. All the damages Faulkner seeks flow, not from alleged negligence or wantonness, but from Bailey's intentional conduct.
In that connection, Faulkner admitted at trial that "all [his alleged] damage[ ] . . . stem[med] from the divorce." (Emphasis added.) He testified that after he discovered the illicit relationship between Bailey and Paris, he regarded his marriage as "irretrievably broken down," and he initiated the divorce action, because "[t]here was no way [he] could get over the lies." Furthermore, he testified:
"There is no way I could get over the . . . manipulation of the very fact of opening up to Floyd Bailey, our marriage counselor and preacher and friend and at the same time was having an affair with my wife. And just as bad for me to know that she knew what he was trying to do, to snake himself into our family and restructure our family to suit his own pleasure. With that kind of knowledge, no sir. There is no hope.
". . . .
"Everything I believe he did was to manipulate and to force us further apart. I think that's obvious."
(Emphasis added.)
Furthermore, Faulkner's counsel argued to the jury:
"This case is about manipulating this man's family and his choices, having him open up to this man as a counselor, telling him all [his] secrets, and he is having an affair with his wife and using those secrets to give him advice that's hurting him.

". . . .
"Can you imagine more mental anguish than in this case? This is the ultimate breach of trust, when you have not only your preacher, a fellow who is supposed to be your friend, who has come to you and said he is a marital counselor, he is going to provide you marital counseling and going to save your marriage, when he is using it against you."
(Emphasis added.)
Faulkner also contends that he suffered mental anguish during the counseling sessions because Bailey always sided with Paris and because he was ashamed that he was suspicious of the relationship between Bailey and Paris. However, he concedes *253 that Bailey's support for Paris during the sessions was based on a bias resulting from their relationship. According to Faulkner, Bailey gave him advice that was calculated to make Paris angry, because, he states, "Bailey knew what buttons to push to aggravate the situation." Faulkner's brief, at 12. Such allegations evidence deliberatenot negligentconduct.
Finally, Faulkner contends that Bailey negligently or wantonly advised him not to accept employment in Baldwin County, resulting in lost income in the amount of $52,000. At other times, however, Faulkner has portrayed this "advice" as intentional conduct motivated by the affair. For example, Faulkner's counsel argued to the jury: "At the time that [Bailey] begged [Faulkner] not to [take the job in Baldwin County], he is having an affair with his wife and he just wants the wife to stick around."
In short, this case is not about negligence or wantonnessit is about intentional conduct. The only claims stated by the allegations in this case assert the amatory torts abolished by § 6-5-331. Damages sought here are the species of damages recoverable for those torts.
Faulkner places great reliance on the fact that he has been careful to style his claims throughout this litigation as negligence and wantonness claims, rather than as an alienation-of-affections claim.[2] However, "[t]his Court has always looked to substance over form." Southern Sash Sales & Supply Co. v. Wiley, 631 So.2d 968, 971 (Ala.1994). "The substance of the allegation, and not its form, determines the character of a complaint." Holland v. Fidelity & Deposit Co. of Maryland, 225 Ala. 669, 670, 145 So. 131, 132 (1932) (emphasis added).
"One cannot sue to recover for injuries arising . . . from an interference with the marriage by simply casting the defendant's conduct as a breach of contract, or negligence, or some other intentional tort. It is that kind of sham that the case law prevents." Gasper v. Lighthouse, Inc., 73 Md.App. at 372, 533 A.2d at 1360; see also D.D., supra.

III. Conclusion
The complaint alleges that Faulkner "was damaged by the failure of his marriage and . . . has suffered extreme mental anguish as a result thereof." That averment is consistent with all the allegations in this case. Thus, the claims stated by these allegations are barred by § 6-5-331. The trial court erred in denying Bailey's motions for a JML. The judgment is, therefore, reversed, and the cause is remanded for the entry of a judgment in favor of Bailey.
REVERSED AND REMANDED.
HARWOOD, SMITH, and BOLIN, JJ., concur.
NABERS, C.J., and SEE, LYONS, and STUART, JJ., concur specially.
PARKER, J., concurs specially (writing issued on January 20, 2006).
SEE, Justice (concurring specially).
Not everything is a legal question to be decided by a judge. "Sometimes . . . the law is that the judicial department has no *254 business entertaining the claim of unlawfulnessbecause the question is entrusted to one of the political branches or involves no judicially enforceable rights." Vieth v. Jubelirer, 541 U.S. 267, 277, 124 S.Ct. 1769, 158 L.Ed.2d 546 (2004). In this free society there is a great deal of conduct of which I may disapprove; but, that others may be free, we may not ban that conduct by judicial fiat. Matters of ethics, decency, and faith we judge only in our capacities as citizens.[3]
"`[I]n a democratic society legislatures, not courts, are constituted to respond to the will and consequently the moral values of the people.'" Gregg v. Georgia, 428 U.S. 153, 175-76, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976) (joint opinion of Stewart, Powell, and Stevens, JJ.) (quoting Furman v. Georgia, 408 U.S. 238, 383, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972) (Burger, C.J., dissenting)). In this Constitutional governmentdesigned to protect me from the oppression of othersif I wish to ban conduct of which I disapprove, then I must convince other citizens to vote with me to change the law, or the Constitution.[4] Otherwise, I must by advocacy and example seek to change the moral tone of society.
NABERS, C.J., and STUART, J., concur.
LYONS, Justice (concurring specially).
An adulterous wife has undisputedly engaged in consensual extramarital sexual activity with the couple's marriage counselor. The main opinion enforces the legislative prohibition against a cause of action for alienation of affections,[5] leaving the cuckolded husband without a remedy. I agree fully, albeit reluctantly, with the main opinion.
As the main opinion points out, our Court has declined to permit creative casting of a cause of action to circumvent the prohibition against amatory torts. See D.D. v. C.L.D., 600 So.2d 219, 223 n. 5 (Ala.1992) ("As this Court recognized in Howton v. Avery, [511 So.2d 173, 174 (Ala. 1987)], any claim for damages against a third party, no matter how denominated, that is based on allegations of interference with the marriage relationship is barred by § 6-5-331[, Ala.Code 1975]."). Since these pronouncements, the legislature has had ample opportunity to amend § 6-5-331, Ala.Code 1975, if it saw fit to do so.
An argument could be made that when § 6-5-331 was enacted in 1935, the legislature contemplated only the prohibition of claims for damages by a jilted party against a gratuitous interloper, such as a neighbor or a coworker. From there, a court might, if it were so disposed, carve out a "judicial exception" to the statute to cover instances where the interference arises in a setting where, as here, the interloper has assumed a duty to the victim. See the dissenting opinion in Strock v. Pressnell, 38 Ohio St.3d 207, 220, 527 N.E.2d 1235, 1246 (1988):
"As eloquently stated by Judge Cacioppo of the court of appeals in her concurrence and dissent below:
"` . . . [T]his case does not resemble your garden variety seduction scenario. The wife did not get involved with *255 the milkman, the mailman or the guy next door. Here, the couple's minister, under the guise of offering pastoral counseling services, abused the trust placed in him. This trust was the raison d'etre of the relationship. It is also what distinguishes this case from those which the legislature intended to abolish when it did away with amatory actions. This distinction also applies to Strock's claim of misrepresentationthis was not your average lover's ruse.'"
(Sweeney, J., dissenting; emphasis added.)
But we have absolutely no legislative history in Alabama to guide us.[6] Moreover, even if we had legislative history, we could resort to it only when the meaning of a statute was unclear. Garcia v. United States, 469 U.S. 70, 76 n. 3, 105 S.Ct. 479, 83 L.Ed.2d 472 (1984). Here, the legislature has spoken in broad terms, stating: "There shall be no civil claim" for amatory actions. Carving out judicial exceptions to an unambiguous statute violates § 43 of the Alabama Constitution of 1901.[7]
This case presents an interesting analogue to our recent opinion in Hexcel Decatur, Inc. v. Vickers, 908 So.2d 237, 240 (Ala.2005). We there rejected a defendant's invitation to ignore this Court's previous construction of a statute in a setting where the legislature has failed to amend the statute in response to our decisions. Had we accepted the defendant's invitation, we would have closed the door to a plaintiff's recovery. We declined to do so, and the plaintiff had his day in court. Today, we reject a plaintiff's invitation to ignore this Court's previous construction of a statute in a setting where the legislature has failed to amend the statute in response to our decisions. Had we accepted the invitation, we would open a previously closed door. We have declined to do so, and the plaintiff does not have his day in court. While those who applauded our fidelity to precedent on the previous occasion may be disappointed with the result in this case, intellectual honesty requires recognition of consistency, a commodity without which this Court forfeits its credibility.
This Court stated in Alabama State Federation of Labor v. McAdory, 246 Ala. 1, 9, 18 So.2d 810, 815 (1944), that "[a]ll . . . questions of propriety, wisdom, necessity, utility, and expediency are held exclusively for the legislative bodies, and are matters with which the courts have no concern." I construe this limitation to require that this Court implement legislative policy with which I might personally disagree. But I do not read it to require that I sit mute while we do so. Indeed, on *256 previous occasions, this Court, while recognizing limitations on judicial authority, has suggested the need for change. See, e.g., Ex parte Perkins, 851 So.2d 453, 455 n. 1 (Ala.2002) ("As the judicial branch of government, this Court can only interpret the law. We urge the Legislature to expeditiously develop procedures for determining whether a capital defendant is mentally retarded and thus ineligible for execution."); and Etheridge v. State ex rel. Olson, 730 So.2d 1179, 1182 (Ala.1999) ("We note again, as we have done on previous occasions, that a court does not have jurisdiction to interfere in an election result unless a statute authorizes it to do so. The Legislature has made this abundantly clear. See § 17-15-6. We strongly urge the Legislature to reexamine § 17-22A-21.").
Following a clear legislative command and adhering to the doctrine of stare decisis is not always a pleasant duty for a judge. To be quite blunt, in this case I am holding my nose. The very idea that a marriage counselor who owes a duty to a husband and wife can escape liability for the consequences of his extramarital affair with a party to the marriage is, I respectfully submit, absolutely horrid public policy. Consistent with Alabama State Federation of Labor v. McAdory, I fully recognize that I am not employed by the people of this State to enforce through judicial fiat my personal views of sound legislative policy. If I thought otherwise, I would have voted to affirm the judgment in this case. However, I do take the title of "Justice" to be more than a platitude; I believe it reflects a responsibility to call attention to a situation deserving of further consideration when I deem myself required by my oath to reach a result that is personally offensive. Today is just such an occasion.
If I were a member of the Alabama Legislature, I would immediately amend § 6-5-331 so as to provide that nothing in the statute should preclude a civil cause of action when a person who has assumed a duty toward a husband and wife with respect to the status of their marital relationship thereafter has sexual contact, as defined in § 13A-6-60(3), Ala.Code 1975,[8] with one of the parties to the marriage during the existence of the marital relationship. I would further provide that the act would apply to all civil actions commenced after it was signed into law and that any such action would be subject to a six-year statute of limitations, running from the latter of the last sexual contact during the marriage or the date of the divorce,[9] so that Faulkner would have his day in court. But I am not a member of the legislature, and I must concur in reversing the judgment in favor of Faulkner.
PARKER, Justice (concurring specially).
The separation of powers among the branches of republican government inherent in the Alabama Constitution of 1901, and expressly set forth in §§ 42 and 43 thereof, requires the judicial branch to respect statutes duly enacted by the Alabama Legislature and otherwise in conformity with the Alabama Constitution. This is true even when a court has grave doubts about the wisdom or propriety of a statute.
In 1935, the Alabama Legislature abolished the ancient common-law tort of alienation *257 of affectionswhich recognized a civil cause of action for outside interference in marital relationsby passing what became § 6-5-331, Ala.Code 1975. Therefore, to the extent that the action at hand involves alienation of affections, it no longer has basis in Alabama law, and the trial court's judgment for the plaintiff must be reversed.
This case, however, is not presented as an alienation-of-affections action but rather as an action alleging negligence and wantonness on the part of a pastor who, while counseling James and Paris Faulkner purportedly to preserve and strengthen their marriage, simultaneously engaged in adultery[10] with Mrs. Faulkner, thus contributing to the breakup of the Faulkners' marriage.
In the main opinion, Justice Woodall cites a number of cases from other states in which statutes abolishing alienation-of-affections causes of action have been broadly interpreted to abolish causes of action brought under other theories or titles that are substantively indistinguishable from alienation-of-affections actions. Justice Woodall then argues that similar principles are found in Alabama law and that Ala.Code 1975, § 6-5-331, precludes Mr. Faulkner's action as an alienation-of-affections action being presented under other guises.
Although I agree with the holding of the main opinion, I write separately to caution that it not be extended so far as to bar an action against a state-licensed professional such as an attorney who seduces his client or a doctor who seduces his patient. I also write further to note that the lower court itself went too far in instructing the jury to find what amounts to clergy malpractice, because its doing so constituted an impermissible extrajurisdictional intrusion into the independent sphere of church government.

I.
Alabamians have long recognized marriage as a divinely created institution that unites a man and a woman in a unique covenant. In support of this recognition, Alabamians have actively resisted efforts to alter the institution of marriage in any way that would deny or undermine its divine origin and sacred character.[11] Because of Alabama's consistently strong defense of marriage, I do not believe the Alabama Legislature intended that § 6-5-331 be interpreted as broadly as similar statutes in other civil government jurisdictions.
A review of the history of this provision and applicable court precedents supports this understanding. Three years after the legislature enacted § 6-5-331 in 1935, this Court held in Young v. Young, 236 Ala. *258 627, 184 So. 187 (1938), that the statute abolished criminal conversation (action by a husband against a third party who had had sexual intercourse with the husband's wife). In 1942, however, when the passage of § 6-5-331 was still fresh in the Justices' minds, this Court held in Henley v. Rockett, 243 Ala. 172, 8 So.2d 852 (1942), that § 6-5-331 did not bar a wife from seeking an injunction against a woman who sought to alienate the affections of the plaintiff's husband:
"Actions at law for damages for alienation of affections or criminal conversation have been abolished by statute in Alabama. . . .
"We do not think it condones in any way the grievous wrongs of such course of conduct, nor strikes down any other remedy, legal or equitable."
243 Ala. at 176, 8 So.2d at 855.
Likewise, even the Alabama cases cited by the majority in favor of its holding do not preclude the limited application of those cases that I suggest in this opinion. In Howton v. Avery, 511 So.2d 173 (Ala. 1987), the Court issued a one-page per curiam opinion that says only that adultery, alienation of affections, and criminal conversation are all inextricably intertwined. In D.D. v. C.L.D., 600 So.2d 219 (Ala.1992), the Court held that a husband's action seeking damages from his adulterous wife and her lover for abuse of process, invasion of privacy, negligence, wantonness, and intentional infliction of emotional distress was in essence an alienation-of-affections action barred by § 6-5-331.
Neither Howton nor D.D., however, involved a breach of a professional duty. In neither of those cases did the alienation of affections occur during or in relation to the performance of professional duties by a psychologist, doctor, lawyer, guardian, or other professional licensed by the state. I do not believe the legislature ever intended that such professionals should be at liberty to take advantage of their clients, patients, wards, or other recipients of professional services with impunity. One who undertakes to provide such services assumes certain duties to the patient or client, and entering into a sexual relationship with that patient or client while performing such services may be a breach of that professional duty. Nothing in the legislative history or the decisions of this Court suggest anything to the contrary.

II.
Nevertheless, it would be improper for the courts to find that Bailey, as pastoral counselor to the Faulkners, breached a professional duty owed to them. This is not because clergymen are not professionals or because they owe no duty to those they counsel; rather, it is because the nature of church and state as distinct spheres of government precludes state oversight of matters, such as the nature and limits of authority for pastoral counseling, that belong to the jurisdiction of the church. Bailey's authority to counsel is based on the Bible and derived from his status as a pastor of his church; it does not, and should not, derive from a state licensing board. Consequently, civil government involvement in what amounts to claims of "clergy malpractice" is a legal and constitutional minefield that courts have rightfully refused to enter.
In any area of tort law enforceable by state courts, there must be a legal duty to conform to a standard of care. For most people, the standard is that of a reasonable man. A state-licensed professional, however, is judged by the higher standard of care imposed by the rules of his profession or the standard normally practiced by a reasonable practitioner of his profession. For example, a medical doctor is judged *259 by the standard of a reasonable doctor. The standard of care for a medical specialist is even higher, reflecting the particulars of the field of specialty. What is common to each of these professional standards and their corresponding duties of care is that the state plays a role in establishing, or at least confirming, those standards and, consequently, in litigation before a court may judge those standards and their application or misapplication.
Although a church clergyman is also a professionalin fact, a member of one of the first professions historically recognizedhis status derives from the church, not the state, and his professional standards are based on the Bible and church doctrine, not on civil government statutes. Furthermore, when clergymen counsel their parishioners, their advice almost inevitably involves theology and doctrine as applied to practical living. Because of this, different churches and different pastors will teach and apply different understandings of doctrine.
For example, some churches and pastors believe divorce is wrong under all circumstances, others believe divorce is justified in cases of adultery or abuse or other circumstances, and others simply accept divorce as necessary in some cases without finding explicit grounding for their view in Biblical authority. Similarly, pastors and other religious counselors may differ in their views of procreation, child discipline, and other issues about which parishioners may seek counseling. Whatever the issue and however well or poorly a teaching or its application are grounded in Biblical authority, does the state have the competence or the authority to address these issues and set a standard for appropriate religious counseling? It does not.
In fact, if the civil authority were even to attempt to establish a standard for judging clergy malpractice, the state would unavoidably entangle itself in matters of theology and church doctrine that are not only outside its proper jurisdiction, but also in violation of the establishment clause of Art. I, § 3, of the Alabama Constitution of 1901, which is designed to protect the right of people of Alabama to worship God and otherwise to fulfill religious duties without interference by civil government authorities, including judicial authorities.
Given the fact that the state has neither the ability nor the authority to identify or enforce the proper standard of care for religious counseling, the State of Alabama has wisely and consistently refused to recognize a tort of clergy malpractice.
In Handley v. Richards, 518 So.2d 682 (Ala.1988), this Court affirmed the trial court's order granting a motion to dismiss an action on the ground that Alabama does not recognize a cause of action for clergy malpractice. Justice Maddox, in his special concurrence, noted the case of Nally v. Grace Community Church of the Valley, 157 Cal.App.3d 912, 204 Cal.Rptr. 303 (1984), as the first case to advance the theory of clergy malpractice,[12] and also noted Hester v. Barnett, 723 S.W.2d 544 (Mo.Ct.App.1987), in which the Missouri Court of Appeals held that the tort of clergy malpractice does not exist in Missouri.
The Alabama Supreme Court again refused to recognize a tort of clergy malpractice in Peelegrine v. Sullivan, 741 So.2d 406 (Ala.1999). In his special concurrence *260 in Peelegrine, Justice Houston specifically adopted Justice Maddox's special concurrence in Handley, supra. In short, Alabama has never recognized a tort of clergy malpractice, nor, so far as I can tell, has any other state, and with good reason: This is an area in which the courts simply do not belong.[13]

III.
The case before us presents only two logical alternatives: either Bailey's conduct was alienation of affections or it was clergy malpractice. To the extent it was alienation of affections, the cause of action was abolished by § 6-5-331. To the extent it was clergy malpractice, Alabama has never before recognized that tort and should not start recognizing it today.
Without a doubt, Bailey's conduct was reprehensible. But the judicial system, like civil government itself, was not established to remedy every wrong and avenge every evil. Nor should the courts attempt to exercise jurisdiction they do not have or to intervene in areas where the legislature has specifically and lawfully prohibited them from doing so.
Bailey's actions lie outside the authority of this Court to remedy or avenge. If Mr. Faulkner would seek further redress, he should do so in the ecclesiastical court of his church or denomination (see, e.g., Matthew 18:15-18 and I Corinthians 5:12, 6:1-5), which may order Bailey to provide restitution that this Court may not order to ameliorate the financial hardship of the divorce. If Bailey were to refuse a church order requiring him to provide restitution, the church court could excommunicate him or apply other Biblical discipline as a sanction for that refusal.
If the actions of the church court were in the end also to fall short in some respect, Mr. Faulkner would still have one final and utterly reliable recoursedirect appeal to the One our Founding Fathers freely acknowledged as the Supreme Judge of the World (see Declaration of Independence).
NOTES
[1] During the litigation, Bailey moved for a summary judgment, arguing, among other things, that Faulkner's claims were an improperly recast claim of alienation of affections. The trial court denied that motion, but, in doing so, certified to this Court, pursuant to Ala. R.App. P. 5, the following question for appeal of an interlocutory order: "Whether the allegations in the plaintiff's complaint constitute a claim [of] alienation of affections, and if so, whether plaintiff's claims are barred by Ala.Code § 6-5-331 (1975)." On July 22, 2003, this Court denied Bailey's petition for permission to appeal the denial of the summary judgment.
[2] Faulkner also argues that he has not expressly sought damages for "loss of consortium." Implicit in this argument is that there could be no alienation-of-affections action in the absence of an express claim of loss of consortium. However, loss of consortium is only one element of damages recoverable under a traditional amatory-tort claim. Also recoverable were punitive damages and damages for humiliation, mental anguish, and pecuniary loss, which Faulkner did seek.
[3] "[T]he judicial [department] shall never exercise the legislative and executive powers, or either of them; to the end that it may be a government of laws and not of men." § 43, Ala. Const.1901.
[4] See Ala. Const.1901, art. I, §§ 1-36, Declaration of Rights.
[5] Section 6-5-331, Ala.Code 1975, states: "There shall be no civil claims for alienation of affections, criminal conversation, or seduction of any female person of the age of 19 years or over."
[6] We do have a contemporaneous explanation offered by this Court in an opinion decided three years after the enactment of the legislature's prohibition against amatory actions. See Young v. Young, 236 Ala. 627, 631, 184 So. 187, 190 (1938):

"The well known reason for striking down the causes of action named in the act, all growing out of relations between the sexes, was in response to a public sentiment, after wide discussion, to the effect that such actions had been so abused, made the means of exploitation and blackmail, that the existence of such causes of action had become of greater injury than of benefit to society."
[7] Section 43 states:

"In the government of this state, except in the instances in this Constitution hereinafter expressly directed or permitted, the legislative department shall never exercise the executive and judicial powers, or either of them; the executive shall never exercise the legislative and judicial powers, or either of them; the judicial shall never exercise the legislative and executive powers, or either of them; to the end that it may be a government of laws and not of men."
(Emphasis added.)
[8] Section 13A-6-60(3) states: "SEXUAL CONTACT. Any touching of the sexual or other intimate parts of a person not married to the actor, done for the purpose of gratifying the sexual desire of either party."
[9] The Faulkners were divorced on January 4, 2001.
[10] I refer to the behavior of the pastor and Mrs. Faulkner as "adultery" rather than a "consensual, sexual relationship" because I consider the latter expression a politically correct euphemism that obscures the gravity of their misdeed.
[11] For example, in response to nationwide efforts by homosexual activists to reduce the marriage covenant between one man and one woman to a mere contract between two (or more) people regardless of their sex, the Alabama Legislature reaffirmed its recognition of the institution of marriage as ordained by God rather than imagined by man by passing the Alabama Marriage Protection Act, Ala. Code 1975, § 30-1-19, as well as Act No. 2005-35, Ala. Acts 2005, which proposes the "Sanctity of Marriage Amendment" to the Alabama Constitution of 1901.

This proposed amendment, which recognizes marriage as "inherently a unique relationship between a man and a woman," was passed overwhelmingly by the Alabama Legislature (85-7-1 in the House and 30-0 in the Senate) earlier this year. It is scheduled to be voted on by the people in June 2006.
[12] In Nally a divided appellate court allowed the action to be maintained, but the California Supreme Court subsequently ordered that the Nally opinion be "decertified." Four years later the case reached the California Supreme Court, which refused to recognize a claim of clergy malpractice. Nally v. Grace Community Church of the Valley, 47 Cal.3d 278, 763 P.2d 948, 253 Cal.Rptr. 97 (1988).
[13] See Samuel Ericsson, Clergymen Malpractice: Ramifications of a New Theory, 16 Val. U.L.Rev. 163, 176 (1981), and Ex parte G.C., 924 So.2d 651, 661 (Ala.2005) (Parker, J., dissenting).