DECISION. *Page 3 
{¶ 1} In 1995, The Christ Hospital ("TCH") and the University of Cincinnati entered into the Joint Operating Agreement ("JOA") and created the Health Alliance of Greater Cincinnati ("the Alliance"). The Alliance was created to manage certain Cincinnati-area hospitals as an integrated system. The JOA has been amended periodically, most recently in 2001. Currently, the JOA encompasses the Alliance and its member hospitals, TCH, The St. Luke Hospitals, Inc. ("SLH"), University Hospital ("UH"), Jewish Health Systems, Inc. ("JH"), and Fort Hamilton Hospital Holding Company ("FH"). The Alliance's mission, as stated in JOA Section 2.1 is "to further the charitable, educational and scientific needs of the [Alliance] and the participating entities [the hospitals] with respect to teaching, research and meeting the health care needs of the communities served by the [hospitals]."
 {¶ 2} Under Article IV of the JOA, certain powers are reserved to the participating hospitals. JOA Section 4.2(a) provides that the hospitals "maintain their ownership of their own property, plants, and equipment (subject to the rights of the [Alliance] to cause the transfer of such assets pursuant to this agreement) and continue to exercise ultimate responsibility for fulfilling their respective charitable missions and obligations." JOA Section 4.2(e) gives the hospitals the power to receive and review financial and operating reports from the Alliance and to monitor the Alliance's performance of its obligations under the JOA "to ensure compliance with legal and regulatory requirements, accomplishment of the Alliance's mission and goals, and financial stability and competitive positioning of the [Alliance] and the [hospitals]." JOA Section 4.2(f) reserves to the hospitals the power to approve *Page 4 
the sale, lease, or disposition of their "major assets" and to approve any changes in the mission or the strategic goals of the Alliance. JOA Section 4.2(g) provides that the hospitals "retain the right to declare an event of default under the terms and conditions set forth [in the JOA]."
 {¶ 3} JOA Section 6.3 obligates the Alliance to "at all times operate the Alliance consistent with the charitable missions of the [Alliance] and the [participating hospitals]." JOA Section 16.2 provides that the participation of any hospital in the Alliance may be terminated "upon the occurrence of an event of default, by any non-defaulting party after notice from the non-defaulting party to the defaulting party and any non-defaulting party and a failure to cure by the defaulting party as described in section 16.4[.]" JOA Section 16.4 states that the failure of the Alliance to perform any of the terms, covenants, conditions, or provisions contained in JOA Articles III, IV, V, VI, VII, XII, XIV, XV, or XVI, when the failure continues for more than 30 days, constitutes an event of default if written notice of the event of default has been given to the Alliance. If the Alliance diligently proceeds within 30 days to cure the default, the cure time can extend beyond 30 days. If no cure is attempted within 30 days, the non-defaulting hospital may terminate its participation in the JOA by giving written notice to the other parties. JOA Section 20.15 provides that "no party shall bring any action or proceeding with respect to any dispute arising under this agreement without providing sixty (60) days prior notice to the other parties. Such notice shall specify the issues to be raised and the relief to be sought by the party intending to bring such action or proceeding. During such sixty (60) day period, the parties agree to use their best efforts to resolve any such dispute." *Page 5 
 {¶ 4} In 2005, the Alliance was attempting to convince the participating hospitals to effectively give up many of their reserved powers. TCH and SLH refused to approve the changes. In October of 2005, TCH board members became concerned about the future of TCH in the Alliance. Alliance CEO Ken Hanover had made disturbing remarks at a meeting of the TCH board of directors about the future viability of TCH at its Mt. Auburn location. TCH board members believed that Hanover was contemplating closing the doors of TCH in Mt. Auburn and moving the hospital to the suburbs. In response, TCH's board formed a task force to investigate its options to remain viable and to fulfill its charitable mission. TCH's board hired the Accenture consulting group to perform a study regarding TCH's future viability and the options that would allow TCH to continue to carry out its charitable mission. Based upon Accenture's report and its own task force's investigation, on January 12, 2006, TCH submitted a notice of withdrawal from the Alliance, citing purported uncured events of default: (1) the failure of the Alliance and UH to agree on payments due, and (2) the non-delivery of certain certificates. A January 31, 2006, letter by the chairman of TCH's board triggered the mandatory 60-day cooling-off period.
 {¶ 5} On March 1, 2006, without waiting for the conclusion of the mandatory 60-day cooling-off period, the Alliance filed a declaratory-judgment action against TCH. The Alliance asked the trial court to declare that there was no basis upon which TCH could withdraw from the Alliance. TCH sent notice to the Alliance on March 8, 2006, of additional events of default, including an allegation that the Alliance was preventing TCH from fulfilling its charitable mission. On March 15, 2006, TCH filed an answer and counterclaims in the declaratory-judgment *Page 6 
action, requesting that the trial court find that TCH had properly withdrawn from the Alliance based upon various uncured events of default. TCH requested, and the trial court granted, a temporary restraining order to prevent the Alliance from binding TCH against its will to $220 million in debt to finance a hospital the Alliance was building in West Chester, Ohio.
 {¶ 6} On June 6, 2006, SLH notified the Alliance of its intent to terminate its participation based upon the uncured events of default regarding TCH, as well as alleged breaches of fiduciary duty by the Alliance. SLH also filed a motion to intervene in the declaratory-judgment action, which the trial court granted. The Ohio Attorney General also intervened to protect the public interest. All parties filed motions for summary judgment.
 {¶ 7} The trial court granted summary judgment in favor of TCH and SLH only on the issue of the $220 million bond debt for the West Chester hospital. The $220 million debt was to be incurred through a Master Trust Indenture ("MTI") to be entered into by the Alliance and its member hospitals and Star Bank. Section 2.05(e) of the MTI stated that, prior to the issuance of any notes, there must be filed with Star Bank "one or more certificates which collectively shall evidence that all of the members of the Obligated Group shall have consented to the issuance of such notes." The trial court held that the MTI did not allow the Alliance to incur additional debt in the absence of the certificates showing consent by the hospitals, that TCH and SLH had not consented, and that the Alliance was not empowered under the MTI and the JOA to provide consent on behalf of the member hospitals.
 {¶ 8} The remaining issues were tried to the bench. The trial court found that TCH's January 12, 2006, letter did not set forth valid grounds for withdrawing *Page 7 
from the Alliance, but that TCH's March 8, 2006, letter did provide a valid basis for withdrawal. The trial court held that TCH could terminate its participation in the Alliance as of April 10, 2006, based upon the good-faith determination by the TCH board that remaining in the Alliance would impede the charitable mission of TCH. SLH was permitted to withdraw as of June 6, 2006, based upon the uncured events of default involving TCH. The court also found additional grounds for termination based upon breaches of fiduciary duty on the part of the Alliance, including trying to tie TCH and SLH to the $220 million in debt without consent, breaching the cooling-off period, expending "enormous sums from the pools of monies collected from the revenues of" the participating hospitals in pursuing this lawsuit while denying TCH and SLH any access to their own revenues to "mount their own case," and using its "superior position" to "improperly constrain TCH's ability to compete in the future." The court ordered the Alliance to work in good faith to transfer operational control to TCH and SLH. The trial court's entry stated, pursuant to Civ. R. 54(B), that there was no just reason for delay. The other hospitals participating in the Alliance have intervened only to protect their rights in the remedy portion of the dispute. The Alliance has appealed.
 {¶ 9} The Alliance's first assignment of error alleges that the trial court erred in declaring that TCH had properly terminated its participation in the Alliance. The Alliance argues that the trial court erred in permitting TCH to withdraw from the Alliance based merely upon a "good faith belief that an event of default had occurred, instead of requiring proof of an actual event of default. The Alliance argues that there was no proof that TCH did not or could not fulfill its charitable mission at any time, and that there was no proof that the Alliance had actually prevented TCH *Page 8 
from fulfilling its charitable mission. Therefore, the Alliance argues, there was no actual event of default as defined in the JOA that would have allowed TCH to withdraw from the Alliance. We disagree.
 {¶ 10} Under JOA Section 4.2(a), TCH's board of directors had the ultimate responsibility for ensuring that TCH was fulfilling its charitable mission. TCH's board had the power, pursuant to JOA Section 4.2(e), to monitor the Alliance's performance of its obligations under the JOA to ensure the fulfillment of the Alliance's mission and goals, as well as the financial stability and competitive positioning of the Alliance and its member hospitals. The Alliance was required by JOA Section 6.3 to operate consistent with its own charitable mission and the charitable missions of its member hospitals, including TCH. JOA Section 16.4(a) provided that the Alliance's failure to perform its obligations under the JOA constituted an event of default. JOA Section 4.2(g) gave TCH the right to declare an event of default under the JOA.
 {¶ 11} R.C. Chapter 1702.01 et seq. set forth Ohio's nonprofit-corporation law. R.C. 1702.30(B) provides that a director of a nonprofit corporation "shall" perform his duties "in good faith, in a manner the director reasonably believes to be in or not opposed to the best interests of the corporation, and with the care that an ordinary prudent person in a like position would use under similar circumstances." In performing his duties, a director "is entitled to rely on information, opinion, reports, or statements, including financial statements and other financial data."[1] *Page 9 
Therefore, each member of TCH's board was required to act in good faith in determining whether an event of default had occurred under the JOA.
 {¶ 12} In 2005, the Alliance was attempting to convince its member hospitals to approve changes to the JOA that would have effectively stripped the individual hospital boards of many of their reserved powers, including the power to withdraw from the Alliance. TCH and SLH resisted the proposed changes. Alliance CEO Ken Hanover attended the October 13, 2005, TCH board meeting. Hanover questioned the long-term viability of TCH in its Mt. Auburn location. Hanover's comments led TCH board members to believe that he favored closing TCH in Mt. Auburn and either merging it with University Hospital or moving TCH to the suburbs.
 {¶ 13} After hearing Hanover's comments, TCH's board decided to form a task force to investigate options to ensure the continued viability of the hospital and the fulfillment of its charitable mission. The task force retained healthcare consultant Accenture to conduct an independent analysis. Throughout the process, Accenture representatives met regularly with members of the task force.
 {¶ 14} Accenture reported that while TCH was then one of the most successful healthcare providers in the region, there were underlying conditions that did not preclude the decline of TCH over the next five to ten years. Accenture specifically examined the Alliance's financial practices as they affected TCH's future. Accenture determined that the Alliance had underinvested in TCH, which could lead to future financial danger. While the Alliance had underinvested in TCH, TCH had generated nearly 40% of the Alliance's operating income. Capital expenditures at TCH were much lower than average. TCH's current assets were depreciating more *Page 10 
rapidly than new assets were being funded. The Alliance projected that, by 2010, TCH would be responsible for generating 95% of the Alliance's net income. Further, the Alliance lacked any strategic plan for TCH. The perception among TCH's medical staff was that the hospital was suffering at the hands of the Alliance. Accenture reported that TCH had the resources to become a successful independent hospital, and that TCH could withdraw from the Alliance while maintaining its market position and continuing to fulfill its charitable mission.
 {¶ 15} Based upon the Accenture report and the findings of its own task force, TCH's board concluded that TCH was still viable in its Mt. Auburn location and that it could best carry out its charitable mission by remaining there. The board also concluded that the Alliance's policies and pattern of conduct were jeopardizing TCH's future and preventing it from fulfilling its charitable mission.
 {¶ 16} In its letter of March 8, 2006, TCH provided notice of events of default on the part of the Alliance. The letter stated that the Alliance "has operated the Health Alliance in violation of the JOA, has not met the stated missions and goals of the Health Alliance, and has impeded TCH's ability to fulfill its mission and effectively compete in the marketplace." TCH pointed out that, under the JOA, the hospitals were charged with ensuring that the Alliance accomplished its goals and that the hospitals and the Alliance fulfilled their respective charitable missions. TCH stated that, contrary to the express terms of the JOA, the Alliance had failed to discharge the duties that would allow the participating hospitals to effectively monitor the Alliance's performance. TCH gave notice that the Alliance had defaulted under the JOA by "disenfranchising" and systematically underinvesting in TCH, preventing TCH from fulfilling its charitable mission, and placing it at a competitive *Page 11 
disadvantage. TCH noted that the Alliance was pursuing academic goals rather than clinical care, and that it was increasing competition among its own participating hospitals. TCH pointed to what it considered particularly troubling conduct on the part of the Alliance: (1) the Alliance had refused to give TCH access to basic information that it needed to carry out its monitoring duties; (2) the Alliance had passed a resolution forbidding discussion with TCH about its dispute with the Alliance; (3) the Alliance had ignored the 60-day cooling-off period; and (4) the Alliance had told TCH that it was no longer seeking to bind TCH to the $220 million debt but had, in fact, pursued the bond financing with the intent to pledge TCH's assets, while refusing to provide TCH with documents relating to the financing. TCH concluded that the Alliance had "fundamentally failed to fulfill its mission, purpose, and goals as outlined under the JOA" and that the Alliance had "inhibited, rather than enhanced, TCH's ability to remain competitive and meet its charitable mission."
 {¶ 17} The Alliance maintained the position that TCH's determination that events of default had occurred was "baseless." The Alliance halted all out-of-court discussion, stating to TCH that "[t]he court will decide."
 {¶ 18} In reaching its determination that the Alliance had defaulted under the JOA, TCH's board relied on its own task force's investigation, the Accenture reports, the views of medical personnel and other staff, the opinion of counsel, and the collective experience and wisdom of the board members. The record shows that TCH's board determined in good faith that the Alliance had jeopardized TCH's ability to fulfill its charitable mission. The JOA gave TCH's board the authority to determine that the Alliance had failed to fulfill its duty under JOA Section 6.3 to operate consistent with the charitable mission of TCH. TCH's board engaged in a *Page 12 
process, carried out in good faith, that culminated in its determination that a default had occurred. The TCH board exercised its reserved power under JOA Section 4.2(g) and declared an event of default. The event of default was not cured. Therefore, the trial court correctly found that TCH was justified in withdrawing from the Alliance.
 {¶ 19} The Alliance also argues under its first assignment of error that the trial court erred in finding that the Alliance owed a fiduciary duty to TCH, that the Alliance had breached that duty, and that breaches of the fiduciary duty owed by the Alliance to TCH provided a separate basis for permitting TCH to withdraw from the Alliance.
 {¶ 20} The Alliance's argument that it owed no fiduciary duty to its member hospitals is untenable. A "fiduciary" is "a person having a duty, created by his undertaking, to act primarily for the benefit of another in matters connected with his undertaking."[2] A "fiduciary relationship" is formed when "special confidence and trust is reposed in the integrity and fidelity of another and there is a resulting position of superiority or influence, acquired by virtue of this special trust."[3] A fiduciary relationship may be created outside of a contractual relationship where both parties understand that a special trust or confidence has been reposed.[4] "The law has been zealous in guarding against abuse" of a fiduciary relationship.[5]
 {¶ 21} Under the JOA, subject to the reserved powers, the participating hospitals allowed the Alliance to manage their affairs, enter contracts on their behalf, *Page 13 
collect and allocate their revenues, maintain their business records, employ their operational staff, and "at all times operate * * * consistent with the charitable missions of * * * the Participating Entities." The hospitals surrendered to the Alliance control of their revenue streams, their power to incur debt, their right to transfer title to their property, and their right to amend their articles or regulations without consent of the Alliance. The hospitals reposed special confidence and trust in the Alliance, which resulted in a position of superiority on the part of the Alliance, the very essence of a fiduciary relationship. The Alliance was in the position of a fiduciary to its member hospitals, and it owed TCH a duty to act for its benefit. Certainly the Alliance owed TCH a duty not to actively harm it. As a fiduciary, the Alliance had a duty to "exercise the utmost good faith and honesty in all dealings and transactions related" to its member hospitals.[6]
 {¶ 22} The trial court found that the Alliance had violated its fiduciary duty to TCH by initiating the declaratory-judgment action in direct contravention of the 60-day cooling-off period in JOA Section 20.15. We point out that the Alliance's action in filing suit within the 60-day period also constituted a breach of the JOA. The trial court found, and the record shows, that the Alliance expended "enormous sums" from the participating hospitals' revenue to prosecute this lawsuit and denied TCH and SLH any access to their revenue to pay for legal fees.
 {¶ 23} The record is replete with evidence that the Alliance breached its fiduciary to TCH. The Alliance used its superior position to improperly constrain TCH's ability to compete in the future by denying TCH access to its revenue stream *Page 14 
and by restricting its operational control, while embarking on a campaign to pay bonuses to doctors who agreed to sign noncompetition agreements to restrict TCH's access to those doctors in the future. The Alliance used TCH's funds to pay for the Alliance's strategic planning while refusing to allow TCH's officers to engage in any strategic planning on TCH's behalf. The Alliance's breaches of fiduciary duty were affecting the ability of TCH to carry out its charitable mission.
 {¶ 24} In an equitable action involving a breach of fiduciary duty, the trial court has discretion in fashioning an appropriate remedy to protect the interest of the beneficiary.[7] We hold that the trial court did not abuse its discretion in permitting TCH to withdraw from the Alliance based upon the breaches of the fiduciary duty the Alliance owed to TCH. The first assignment of error is overruled.
 {¶ 25} The Alliance's second assignment of error alleges that the trial court erred in declaring that SLH properly terminated its participation in the Alliance.
 {¶ 26} It is undisputed that if TCH properly withdrew from the Alliance based upon an uncured event of default, then SLH also properly terminated its participation in the Alliance based upon JOA Section 16.5, which states, "If an Event of Default occurs and continues beyond the cure period provided for in Section 16.4, any non-defaulting Party other than the [Joint Operating Committee], in addition to every remedy existing at law or in equity or under any *Page 15 
provision of this Agreement, may terminate its participation in the Alliance and its status as a Participating Entity hereunder by written notice to the other Parties." We have held that TCH properly terminated its participation based upon an uncured event of default. Therefore, SLH also properly terminated its participation.
 {¶ 27} We point out that the Alliance also breached its fiduciary duty to SLH by refusing to give SLH access to its revenue to pay for its legal fees and by attempting to encumber it with $220 million in debt without its consent. The second assignment of error is overruled.
 {¶ 28} The third assignment of error alleges that the trial court erred in granting summary judgment in favor of TCH and SLH and declaring that the Alliance was barred from consenting on their behalf to the $220 million bond indebtedness under the MTI. We decline to rule on the third assignment of error because it is moot. The Alliance has represented to the trial court[8] and to this court that, to prevent a delay, the Alliance paid cash for the construction of the West Chester hospital. Therefore, there is no question of encumbering TCH or SLH with the debt under the MTI.
 {¶ 29} The first and second assignments of error are overruled, and the third assignment of error is moot. The judgment of the trial court is affirmed.
Judgment affirmed.
HILDEBRANDT, P.J., and CUNNINGHAM, J., concur.
RALPH WINKLER, retired, from the First Appellate District, sitting by assignment.
[1] See R.C. 1702.30(B).
[2] See Groob v. Keybank, 108 Ohio St.3d 348, 2006-Ohio-1189,843 N.E.2d 1170, at ¶ 16, quoting Strock v. Pressnell (1988),38 Ohio St.3d 207, 527 N.E.2d 1235.
[3] See id., quoting In re Termination of Emp. of Pratt (1974),40 Ohio St.2d 107, 321 N.E.2d 603.
[4] See Stone v. Davis (1981), 66 Ohio St.2d 74, 419 N.E.2d 1094;The Camp St. Mary's Assn. of the West Ohio Conference of the UnitedMethodist Church, Inc. v. Otterbein Homes, 176 Ohio App.3d 54,2008-Ohio-1490, 889 N.E.2d 1066.
[5] See In re Termination of Emp. of Pratt, supra.
[6] See Blair v. McDonagh, 1st Dist. No. C-070238,2008-Ohio-3698.
[7] See Biggins v. Garvey (1993), 90 Ohio App.3d 584, 630 N.E.2d 44;Ollick v. Rice (1984), 16 Ohio App.3d 448, 476 N.E.2d 1062;Manchester v. The Cleveland Trust Co. (1953), 95 Ohio App. 201,114 N.E.2d 242.
[8] T.p. 92-98. *Page 1